**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DENISE SANTORO,<br><br>Plaintiff,<br><br>v.<br><br>EDUCATIONAL TESTING SERVICE,<br><br>Defendant. | Civil Action No. 24-9132 (RK) (JTQ)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the Motion for Summary Judgment ("Motion") brought by Defendant Educational Testing Service ("Defendant" or "ETS"). ("MSJ," ECF No. 44-1.) Plaintiff Denise Santoro ("Ms. Santoro" or "Plaintiff") opposed the motion, ("Opp.," ECF No. 45-1), and Defendant replied, ("Reply," ECF No. 46). In support of its Motion and in accordance with Local Civil Rule 56.1(a), Defendant filed a Statement of Undisputed Material Facts, ("D-SOF," ECF No. 44-2), to which Plaintiff filed a response, ("Resp. to D-SOF," ECF No. 45-2), and Defendant filed a subsequent reply, ("Reply to D-SOF," ECF No. 46-1 at 1–78). Plaintiff also filed a Supplemental Statement of Material Facts, ("P-SSOF," ECF No. 45-3), to which Defendant filed a response, ("Resp. to P-SSOF," ECF No. 46-1 at 79–91). The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons below, Defendant's Motion is **GRANTED**.

## I. BACKGROUND[1]

As the record demonstrates, Plaintiff was laid off after nearly two decades of working at ETS as part of a company-wide reduction in force affecting well more than one hundred people. At the time of her termination, Plaintiff was part of a Corporate Strategy Department that ultimately was eliminated and oversaw a relatively small section of ETS's business. As part of broad cost-cutting measures, ETS eliminated her position and distributed her work responsibilities among a number of existing employees. In or around September of 2023, Plaintiff was advised that her employment at ETS would be terminated effective early 2024. After various hiring managers at Defendant—each of whom had never heard of or met Plaintiff—declined to extend Plaintiff an alternative role, Plaintiff rejected Defendant's offered severance package and filed the instant suit, alleging employment discrimination, retaliation, hostile work environment, equal pay, and failure to hire claims under various state and federal laws. In short, as will be detailed through the record evidence, Plaintiff's termination was the byproduct of market forces and business judgment and not, as Plaintiff argues, impermissible discrimination or retaliation. Defendant's Motion for Summary Judgment shall be granted as to all claims.

[1] The parties filed numerous deposition transcripts in support of their briefing. (*See* "Pl.'s Dep.," ECF No. 44-5 at Ex. 1 & ECF No. 45-6; "Weaver Dep.," ECF No. 44-5 at Ex. 2, ECF No. 45-8, & ECF No. 46-2 at Ex. 4; "Nelson Dep.," ECF No. 44-5 at Ex. 3, ECF No. 45-9, & ECF No. 46-2 at Ex. 7; "Lester Dep.," ECF No. 44-5 at Ex. 4, ECF No. 45-13, & ECF No. 46-2 at Ex. 2; "Gorin Dep.," ECF No. 44-5 at Ex. 11, ECF No. 45-14, & ECF No. 46-2 at Ex. 8; "Mazagonwalla Dep.," ECF No. 44-5 at Ex. 15, ECF No. 45-16, & ECF No. 46-2 at Ex. 3; "Johnson-Gregory Dep.," ECF No. 44-5 at Ex. 21, ECF No. 45-15, & ECF No. 46-2 at Ex. 1; "Froah Dep.," ECF No. 44-5 at Ex. 31 & ECF No. 45-5; "Borden Dep.," ECF No. 44-5 at Ex. 37 & ECF No. 45-11; "Chanoch Dep.," ECF No. 44-5 at Ex. 39 & ECF No. 45-12.) The Court herein cites these deposition transcripts using deponent name, volume number, and line number.

Moreover, to the extent either party attempted to dispute any statement of fact without citation to the record, that fact "shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a).

## A. FACTUAL BACKGROUND

### 1. ETS's 2023 Reduction in Force ("RIF")

ETS is a non-profit organization that carries out policy research, develops assessments and related services, and administers tests. (Resp. to D-SOF ¶ 1.[2]) Some of its largest contracts include relationships with College Board, the non-profit organization that administers the SAT and Advanced Placement high school exams, and the educational departments of foreign governments. (Resp. to D-SOF ¶¶ 43, 156.) More than two decades ago, in November 2005, Plaintiff began employment with ETS in the Human Resources ("HR") Department. (Resp. to D-SOF ¶ 2.) Plaintiff worked for six years in various roles in HR. At the end of 2011, Plaintiff applied for the Executive Director for Strategy and Planning position in the Corporate Strategy Department, and was selected for the position in 2012. (Resp. to D-SOF ¶ 6; Pl's Dep. 118:3–119:7.) In Plaintiff's new position, she initially reported to Scott Weaver, ETS's Chief Strategy Officer, who in turn reported to Scott Nelson, the Senior Vice President of Global Strategy and Growth. (Resp. to D-SOF ¶¶ 7–8.) In April 2021, Plaintiff's title was reclassified to simply "Executive Director."[3] (D-SOF ¶ 9; Resp. to D-SOF ¶ 9.)

By 2022, Plaintiff's general responsibilities fell into two camps. First, the majority of her work—at least 60 percent, if not more—was in corporate strategy, serving as Mr. Weaver's key strategy person and assisting in an array of corporate strategy related tasks. (Resp. to D-SOF ¶¶

[2] Unless otherwise noted, any citation to one of the parties' statement of facts or responses thereto indicates that the fact is undisputed.

[3] Plaintiff purports to dispute that Executive Director is a "generic corporate title[]" utilized by ETS that does not capture the varying scopes of work by the employees that hold the title. (D-SOF ¶ 10; Resp. to D-SOF ¶ 10.) Plaintiff's cited testimony, however, does not create a genuine dispute of material fact: Plaintiff's declaration on this issue only asserts that she was "unaware" of different job descriptions for the same Executive Director title. (ECF No. 45-7 ¶ 2.) Plaintiff's professed lack of knowledge on this subject cannot create a dispute of material fact. *See Napier v. City of New Castle*, 407 F. App'x 578, 584 n.6 (3d Cir. 2010).

12, 18.) The remainder of Plaintiff's work—at around or below 40 percent of her time—was spent managing ETS's Artificial Intelligence and Automated Scoring Technology ("AIAST") business, "whereby ETS sells its artificial intelligence and automated scoring technologies to other companies and school districts." (D-SOF ¶¶ 13, 18; Resp. to D-SOF ¶¶ 13, 18.) This AIAST business, however, was a "loss center" with relatively small profits compared to the remainder of ETS's business: revenue between 2 and 4 million annually and gross profit margins hovering around $1.6–1.7 million from 2022 to 2024.[4] (D-SOF ¶¶ 13, 15−16; Resp. to D-SOF ¶¶ 13, 15–16; Weaver Dep. 31:12–19; Nelson Dep. 35:17–36:10.)

Sometime in late April or early May 2022, Plaintiff's supervisor Mr. Weaver left ETS. (Resp. to D-SOF ¶ 27.) Defendant did not fill Mr. Weaver's then-vacant Chief Strategy Officer role, with Plaintiff instead reporting directly to Mr. Nelson. (Resp. to D-SOF ¶¶ 28–29.) Moreover, Mr. Weaver's departure coincided with the consolidation and reduction of corporate strategy work at ETS generally.[5] (D-SOF ¶ 32.) ETS retained a new CEO at this time, Amit Sevak, who became more directly involved in corporate strategy himself. (Resp. to D-SOF ¶¶ 30–31.) As of November 7, 2022, the Corporate Strategy Department was no longer listed on an internal ETS organizational chart. (Pl's Dep. 147:9–148:16; ECF No. 44-5 at Ex. 13.) In May 2023, Plaintiff worked with HR to "Eliminate the Lead Global Growth Analyst role" that had previously been part of the Corporate Strategy Department. (D-SOF ¶ 36; Resp. to D-SOF ¶ 36; ECF No. 44-5 at Ex. 14.) This decision resulted in the termination of a Ms. Alisha Pollard, whose previous work in corporate strategy had

[4] By contrast, ETS's contract with College Board, one of ETS's two largest clients, was an approximately $340 million-dollar annual contract. (Resp. to D-SOF ¶ 43.)

[5] Plaintiff disputes that her personal corporate strategy work "ceased" after Mr. Weaver resigned. (Resp. to D-SOF ¶¶ 32–33.) However, Plaintiff's testimony does not genuinely or materially dispute Defendant's factual assertion that the corporate strategy work had diminished after she began reporting directly to Mr. Nelson. (Pl's Dep. 162:15-163:2.)

been "decentralized and greatly diminished." (*Id.*) In this same email thread in which Plaintiff apprised HR of Ms. Pollard's termination and the elimination of that corporate strategy position, Plaintiff notified HR that the Corporate Strategy Department's "cost center" would be "closing down," with Plaintiff and another employee being transferred to a different cost center.[6] (ECF No. 44-5 at Ex. 14.)

Shortly thereafter, in June or July 2023, senior ETS leadership decided to conduct an organization-wide RIF to reduce expenses, eliminating over 125 positions. (Resp. to D-SOF ¶¶ 37–38, 45.) Mr. Nelson, as the head of his department, testified that he was directed to reduce expenses with an approximate target of 5 to 10 percent across his area of responsibility, which included some 25 employees. (Resp. to D-SOF ¶¶ 39, 45.) To comply with this target, Mr. Nelson selected Plaintiff and Stephanie Canter for termination. (Reply to D-SOF ¶ 45.) In his testimony and contemporaneous email correspondence with HR in August 2023, Mr. Nelson explained that Plaintiff's termination was because the "corporate strategy office no longer exists, and [Plaintiff's] other responsibilities leading the AIAST business unit do not justify a full time leader at her level." (ECF No. 44-5 at Ex. 17; ECF No. 44-5 at Ex. 18; Nelson Dep. 161:22–176:24). As such, Mr. Nelson believed that ETS could no longer justify Plaintiff's total compensation.[7] (Nelson Tr.

[6] The parties do not explain what a "cost center" is, but Plaintiff's cited email indicates that the Corporate Strategy Department itself would close. (*See* ECF No. 44-5 at Ex. 14 ("Department 1003 is closing down."); *see also* Pl's Dep. 150:7–25 (explaining that "cost center 1003" closing down ended the "bucket of money" that would be used for corporate strategy).) Plaintiff's argument that she continued her corporate strategy duties even after this closure does not genuinely or materially dispute that she participated in closing the department itself.

[7] Plaintiff argues that Mr. Nelson never told her these or any other reasons and was inconsistent in the criteria he applied to Plaintiff and Ms. Canter. (*See* Opp. at 20–21; Resp. to D-SOF ¶ 40.) However, Plaintiff does not dispute that Mr. Nelson (1) testified to and (2) contemporaneously emailed these reasons for Plaintiff's termination. (*See id.*; ECF No. 44-5 at Ex. 17; ECF No. 44-5 at Ex. 18; Nelson Dep. 161:22–176:24.)

214:19–215:22.) The decision was not based on Plaintiff's work-related performance. (Resp. to D-SOF ¶ 44.)

On September 20, 2023, before receiving formal notice of her termination, then-General Counsel ("GC") for ETS, Sheree Johnson-Gregory, told Plaintiff on a telephone call that she was being terminated. (Resp. to D-SOF ¶ 47; Johnson-Gregory Dep. 93:2–95:7 (testifying that she confirmed to Plaintiff that she was "on the list" of layoffs after Plaintiff had told her "I know I'm on the list").) Two days later, Plaintiff called Mr. Nelson to tell him that she knew she was being terminated. (Pl's Dep. 224:12–225:7; ECF No. 44-5 at Ex. 22.) Mr. Nelson told her that he could not discuss the decision at that time. (Resp. to D-SOF ¶ 49; ECF No. 44-5 at Ex. 22.) On September 29, 2023, Plaintiff received the formal notification of her termination from HR, to be effective January 4, 2024. (Resp. to D-SOF ¶ 46; ECF No. 44-5 at Ex. 20.) The termination notice included a severance offer, which Plaintiff eventually declined. (*Id.*; Resp. to D-SOF ¶ 62.)

Following Plaintiff's termination, her job responsibilities were distributed to existing employees within Mr. Nelson's department, including Mr. Nelson himself taking over Plaintiff's budget management tasks. (Resp. to D-SOF ¶¶ 40, 59–61.) One of Plaintiff's former direct reports, DeAndrea Hall, continued to manage Plaintiff's AIAST contracts, reporting to Anne-Marie Garrity, one of Mr. Nelson's other direct reports. (Resp. to D-SOF ¶ 59.) There is no evidence in the record to indicate that Plaintiff's former position was ever re-filled following her termination.

2. <u>Plaintiff's Alleged Experiences with & Reports of Discrimination</u>[8]

Plaintiff asserts that concurrent with her termination—as well as across the prior decade—she had been subjected to a hostile work environment and discrimination at ETS that ultimately

[8] In her response to Defendant's statement of facts, Plaintiff states several times, without citation to the record, that Defendant had provided "an incomplete list" of the claimed conduct by Defendant's employees

culminated in her termination. Further, Plaintiff asserts that her termination was likewise motivated by her various complaints to HR and Mr. Nelson about that conduct, and described Defendant's corporate culture as an "old boys['] club." (Pl's Dep. 206:8–20.)

The gravamen of Plaintiff's allegations of discrimination and a hostile work environment involve a smattering of verbal remarks she viewed as demeaning and offensive, as well as two discrete incidents where she contends that she recommended the termination of two employees and was overruled. Plaintiff's allegations are supported almost entirely and solely through her self-serving deposition testimony and declaration.[9] (*See* ECF No. 45-7.) The first of these dates back to May of 2012. Plaintiff testified that, while she was still working in the HR department, Willa Thomas, a former ETS employee, told Plaintiff she needed to get a "coach for [her] appearance," which Plaintiff at her deposition interpreted as a "fat coach." (Reply to D-SOF ¶ 142; Pl's Dep. 252:9-255:2; ECF No. 44-5 at Ex. 46.) Plaintiff testified that she believed that Ms. Thomas's suggestion had actually been the idea of another former ETS employee, TJ Elliot, because Plaintiff did not believe the suggestion was indicative of Ms. Thomas's "personality." (Pl's Dep. 252:9-255:2.)

---

over the years involving discrimination or a hostile work environment. (Resp. to D-SOF ¶¶ 126–27, 30.) To the extent Plaintiff subsequently failed to cite the Court to evidence in the record, the Court need not forage the voluminous record here for other supposed incidents Defendant's discriminatory conduct. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record." (cleaned up)).

[9] The parties' statements of fact contain additional citations to Plaintiff's deposition related to her hostile work environment and sex discrimination claims. Plaintiff, however, concedes in response to Defendant's statement of facts that much of this testimony is "immaterial" to the pending Motion and her various claims; she also fails to marshal such facts in her Opposition to the Motion. (*See* Resp. to D-SOF ¶¶ 132–41, 145; Opp. at 9–16; *see also* P-SSOF ¶ 9.) Accordingly, given Plaintiff's concessions of immateriality and failure to discuss such facts in connection with her claims, the Court will not recount this "immaterial" testimony. *Brown v. Johnson*, 116 F. App'x 342, 346 (3d Cir. 2004) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." (quoting *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983))).

At around this same time,[10] Plaintiff testified that Mr. Elliot did not discipline an employee when that employee, a male, forged Plaintiff and her assistant's signatures in connection with child support paperwork. (Resp. to D-SOF ¶ 143; Pl's Dep. 255:13–256:18.) Plaintiff testified that when she spoke to Mr. Elliot about this incident as grounds for firing that employee, Mr. Elliot responded that "this [was] not the first time" that employee had done this, and that "the poor guy is going through a hard time just let's leave it alone." (Pl's Dep. 256:10–18.) In addition, Plaintiff testified that when HR discovered that a different employee was "on porn eight hours a day on the ETS laptops on the ETS system," she recommended his termination to Mr. Elliot, who again refused. (Pl.'s Dep. 256:19–257:4; Resp. to D-SOF ¶143.) Mr. Elliot's employment with ETS ended in February 2020. (Resp. to D-SOF ¶ 144.)

The majority of Plaintiff's purported discrimination and hostile work environment evidence centers on ETS's former Chief Operating Officer, Eddie Monteiro, and an Associate Vice President, Rui Ferreira.[11] (D-SOF ¶¶ 117–30; Resp. to D-SOF ¶¶ 117–30; P-SSOF ¶ 9.) Mr. Monteiro was hired as ETS's Chief Operating Officer around the end of 2021 or early 2022. Several witnesses in the record testified that Mr. Monteiro's "communication and leadership style was brash, abrasive, direct and unpolished." (D-SOF ¶ 120 (citing testimony from Scott Weaver, Scott Nelson, ETS's Chief HR Officer Sara Lester, Vice President of HR Rukshana Mazagonwalla, and former GC Sheree Johnson-Gregory.) In general, Plaintiff testified that Mr.

[10] Plaintiff did not provide a specific timeframe for the other incidents involving Mr. Elliot but acknowledged that these incidents happened while she was working in HR—a department she left in 2012. (Pl's Dep. 257:13–15.)

[11] There is no deposition testimony in the summary judgment record from Rui Ferreira and Eddie Monteiro. The parties are not specific as to the timeframe of Mr. Ferreira's employment or proximity to Plaintiff's position as an Executive Director. Although the parties indicate that Mr. Ferreira reported to Mr. Nelson—who became Plaintiff's supervisor in 2022—they do not indicate when Mr. Ferreira joined Mr. Nelson's department, and for how long he was in professional proximity to Plaintiff (if at all). (D-SOF ¶ 129.)

Monteiro "treated [her] like dirt." (Pl's Dep. 242:8–13.) Plaintiff testified that the first time she met Mr. Monteiro, he questioned Plaintiff's ability to do her job, asking her "who the F are you that gives you the right to do this work . . . . You're nothing." (D-SOF ¶ 127.) Plaintiff testified that he used profanity profusely and frequently made mocking comments that Plaintiff and other women's bodies were fat and ugly. (*Id.*) Plaintiff's testimony that "he called everyone stupid" when others did not agree with him but focused his name-calling on women was belied by her own acknowledgement that Mr. Montiero called her boss at the time, Mr. Weaver, "an incompetent asshole," a "loser," and a "hypochondriac and a faker." (Pl's Dep. 204:12–205:17.)

In addition to these generalized allegations of conduct from Mr. Monteiro, Plaintiff testified regarding a "Big Idea" project meeting held in May 2022, designed to be a "shark tank" style pitch meeting in which presenters would show business ideas to the new CEO Mr. Sevak and other executives, including Mr. Monteiro. (D-SOF ¶ 34; P-SSOF ¶ 9.) Plaintiff testified that she "led that whole [meeting]," including consolidating the slide presentations, selecting an appropriate room to accommodate social distancing concerns, and setting the seating arrangements. (Pl's Dep. 179:25–187:23.) In particular, this seating arrangement placed meeting presenters and members of the Office of the President at a table in the middle of the room, with "[a]ll others" sitting against the window and walls.[12] (Pl's Dep. 181:14–20.) During the meeting, Plaintiff testified that Mr. Monteiro and other male colleagues were disruptive and rude, mocking Plaintiff and "every single woman that stepped up" to present. (Pl's Dep. 185:4–19, 203:21–

[12] Plaintiff's assertion that "same-level or similarly-situated female employees" were relegated to "the periphery of the room despite the seating plan" in this meeting is not supported by Plaintiff's citation to her deposition. (P-SSOF ¶ 9.) Plaintiff's deposition only reiterates that the complaints made to Ms. Lester by attendees—caused by Plaintiff's own seating chart—were about how "the actual visuals of the meeting looked really bad like it was a lot of men sitting at the table and a lot of women were on the privy." (Pl's Dep. 185:11–19).) None of the cited testimony asserts that *Defendant ETS* had arranged the seating chart at all, let alone that it had place similarly situated women on the periphery of the room.

204:11.) After the meeting, several women complained to Ms. Lester, the HR chief, specifically about Plaintiff's seating arrangement, resulting in a subsequent email from Ms. Lester to Plaintiff and Mr. Nelson that "optically" placing more women "behind/around" the room left many of them "dismayed." (ECF No. 44-5 at Ex. 12; Lester Dep. 114:7–115:6.) Shortly thereafter, in September 2022, Mr. Monteiro was terminated for cause for separate and unrelated improper conduct.[13] (D-SOF ¶ 124.)

Plaintiff's other principal complained-of employee was Rui Ferreira. Mr. Ferreira was an Associate Vice President at ETS who also worked under Mr. Nelson, working primarily on the College Board contract. (D-SOF ¶¶ 41, 129.) Plaintiff testified that Mr. Ferreira was "very condescending" and "extremely rude," and would "totally disregard what [she was] saying and go to someone else." (Pl's. Dep. 207:15–24.) Per Plaintiff, Mr. Ferreira was not "a bad guy in the beginning and then all of a sudden he became like a mini Eddie [Monteiro]."[14] (Pl's Dep. 207:17–19.)

Plaintiff acknowledges that she never submitted a written report of harassment, discrimination, or retaliation at any point during her employment with ETS. (Resp. to D-SOF ¶ 26.) Instead, Plaintiff testified that she verbally reported and/or complained about Mr. Monteiro

[13] The circumstances of Mr. Monteiro's termination and other HR related incidents—conduct involving alcohol and an intra-office relationship—though discussed at length by the parties in their statements of fact, are not relevant to Plaintiff's claims. Plaintiff makes no mention whatsoever of Mr. Monteiro's conduct in her Opposition to the Motion, let alone in her supplemental statement of facts. (*See generally* Opp.; P-SSOF.) Plaintiff does not allege that the bases of Mr. Monteiro's termination purport to involve Plaintiff at all, and, accordingly, such has no bearing on her claims. *See Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) (explaining that conduct relevant to hostile work environment claim must have "altered" the *plaintiff's* working conditions in some way).

[14] Plaintiff asserts in her supplemental statement of fact that Mr. Ferreira acted in this way "towards Plaintiff but not males" at ETS. (P-SSOF ¶ 9.) However, the actual cited testimony from Plaintiff's deposition regarding Mr. Ferreira makes no mention of sex whatsoever and only references his rudeness in his interactions with Plaintiff—and makes no mention or reference to males whatsoever (Pl's Dep. 207:17–25, 208:22–24.)

and Mr. Ferreira's conduct to a number of HR officials and to her supervisor, Mr. Nelson.[15] (Pl's Dep. 112:19–113:10 (testifying that Plaintiff "went to H.R. several times" and "went to my manager [Scott Nelson] several times" but that "[n]o one wrote up anything"); 200:5–7 (testifying that she reported Eddie Monteiro "several times" and that she reported Rui Ferreira); 203:24–204:4 (testifying that she reported Mr. Monteiro to HR Chief Sara Lester about his comments to Plaintiff and was told that "this is how people talk" in his generation and that that was "why [Plaintiff] didn't understand him"); 205:25–206:7 (testifying that Plaintiff talked to Scott Nelson several times about Mr. Monteiro's comments hurting her feelings and feeling "very uncomfortable around him"); 206:8–207:8 (testifying that she spoke to ETS HR personnel Rukshana Mazagonwalla, Justin Patterson, and Sara Lester about Mr. Monteiro); 208:16–210:1 (testifying that she spoke to Scott Nelson and Justin Patterson from ETS HR about Rui Ferreira's conduct several times across May to August 2023); 245:4–5 (testifying that she complained about pay disparities to her former boss Scott Weaver before his departure); Johnson-Gregory Dep. 61:21–64:10 (former GC Ms. Johnson-Gregory testifying that Plaintiff complained to her about Mr. Monteiro being rude and offensive).)

In contrast, ETS contends that Plaintiff "never made any complaints of discrimination, harassment or retaliation." (D-SOF ¶ 26.) At most, Defendant cites to testimony stating that

[15] In addition to alleging that Plaintiff made such complaints, Plaintiff asserts that her coworker, Ms. Stephanie Canter, made similar reports of sex discrimination in the lead up to Ms. Canter's layoff. (*See* Resp. to P-SSOF ¶ 1.) With no cited deposition testimony from Ms. Canter herself in the record, the only evidence Plaintiff cites suggesting that Ms. Canter complained of sex discrimination regarding Mr. Ferreira is Plaintiff's own sworn declaration. (*See* ECF No. 45-7 ¶ 1 ("In or around early-September 2023, Stephanie Canter confirmed with me that she, too, had complained of sex discrimination to ETS management and to HR, including complaining about the sex-discriminatory behavior of Rui Ferreira.").) Plaintiff also cites to the deposition of Mr. Nelson, their shared supervisor, in which he testified that he "recall[ed] a conversation that Stephanie and I had where she had broad concerns about her future at ETS and some concerns about coworkers," but specifically did not "remember a complaint about Rui." (Nelson Dep. 94:4–22.) This generalized deposition excerpt does not corroborate Plaintiff's claim that her coworker, Ms. Canter, ever reported an allegation of sex discrimination to Mr. Nelson, including about Mr. Ferreira.

Plaintiff informally complained to then-GC Ms. Johnson-Gregory in a "gossipy" way about Mr. Monteiro and that Plaintiff expressed generalized distaste for working with Mr. Ferreira to their shared supervisor Mr. Nelson. (Johnson-Gregory Dep. 131:17–138:3 (former GC Ms. Johnson-Gregory testifying that Plaintiff only complained about Mr. Monteiro in informal sense; that they only "would have conversations in a gossipy way"); Nelson Dep. 112:9–116:1 (Plaintiff's final supervisor Mr. Nelson testifying that although Plaintiff complained about her working relationship with Mr. Ferreira, she never complained about sex discrimination, only that he was "slimy").)

The remainder of the cited testimony, particularly from HR officials, categorically denies Plaintiff making such complaints. (D-SOF ¶¶ 26, 131; Lester Dep. 69:16–77:19, 85:12–89:22 (former HR chief Sara Lester testifying that Plaintiff never discussed Mr. Monteiro or Mr. Ferreira's conduct to her in any way at any time); Mazagonwalla Dep. 74:23–81:4 (VP of HR Ms. Mazagonwalla testifying that Plaintiff never complained to her about her treatment at ETS at any time); Weaver Dep. 60:9–24 (Plaintiff's former supervisor Mr. Weaver testifying that he was "not aware . . . at all" of Plaintiff's complaints about sex discrimination or undercompensation).)

In addition, Plaintiff provides only generalized time-frames or no time-frame at all of her alleged reportings. For example, Plaintiff testified that she complained about Mr. Ferreira at "several," albeit unspecified times from May to August 2023—the months leading up to her termination. As to Mr. Monteiro, Plaintiff provides no date(s) or even a generalized time-frame as to when she supposedly reported or complained about Mr. Monteiro, who was terminated in September 2022. (*See* Pl's Dep. 208:16–210:1; P-SSOF ¶ 10 (asserting that Plaintiff reported "sex discrimination to management and HR during the timeframe of May-August 2023").) Plaintiff testified that ETS took no action following any of her alleged complaints. (Pl's Dep. 240:24–241:5.)

3. Plaintiff's Employment Applications After Termination

Attached to Plaintiff's termination materials was a notice that Plaintiff could apply to open positions within ETS between September 29, 2023, and her anticipated termination date on January 4, 2024. (Resp. to D-SOF ¶ 56; ECF No. 44-5 at Ex. 20.) Plaintiff applied to five internal ETS positions: Chief of Staff to the Global Chief Marketing Officer, Corporate Governance Associate, Director Product Management, Executive Director (Product Line Manager), and Head of K-12 Partnerships.[16] (Resp. to D-SOF ¶¶ 66, 79, 110.) Across each of these positions, there is no evidence in the record—aside from Plaintiff's surmise and speculation that she had a "scarlet letter"—that Mr. Nelson or anyone else discussed above ever interacted with the hiring managers and discussed Plaintiff relating to these positions in any way.[17] (D-SOF ¶¶ 113–16.)

*a. Chief of Staff to the Global Chief Marketing Officer*

On October 24, 2023, Plaintiff applied to the first of these roles, the Chief of Staff to the Global Chief Marketing Officer. (Resp. to D-SOF ¶ 66.) The hiring manager and ultimate decisionmaker for the position, Ms. Michelle Froah, worked with a recruiter in ETS's talent acquisition office to create the job description and field over 100 applications for the role. (Resp. to D-SOF ¶¶ 67–69.) The job description, among other things, specified a preference for marketing experience, with Ms. Froah's key criteria for the role being "to help transform ETS's marketing function and how ETS marketed itself." (D-SOF ¶ 70; Resp. to D-SOF ¶ 70; *see also* Froah Dep. 43:3−19.) Ms. Froah testified that she selected Josh Orye for the position based on the

[16] In her Opposition, Plaintiff voluntarily withdrew her failure to hire claim for the Head of K-12 Partnerships position. (Opp. at 23 n.6.) Accordingly, the Court will only address the other four positions.

[17] Plaintiff's assertion in her response to Defendant's statement of facts that one of the hiring managers for the Corporate Governance Associate position "reports to Nelson's organization" is unsupported by any citation to the record. (Resp. to D-SOF ¶ 115.) In fact, this unsupported assertion is directly countered by that hiring manager's own sworn declaration. (ECF No. 46-3 ¶¶ 1–4.)

recommendation of a former colleague, Mr. Orye's experience with marketing, and his previous role as a chief of staff. (Resp. to D-SOF ¶¶ 73–76.) By contrast, Plaintiff's resume contained no experience with or references to marketing, and she was not given an interview. (Resp. to D-SOF ¶ 72.) Ms. Froah testified that she was "unaware of any reports or complaints of discrimination made by Plaintiff or any other ETS employee" and that "[n]o one at ETS told Ms. Froah not to select Plaintiff for an interview . . . or not to offer Plaintiff" this role. (D-SOF ¶¶ 77–78; Resp. to D-SOF ¶¶ 77–78.)

*b. Corporate Governance Associate*

On November 2, 2023, Plaintiff applied to the Corporate Governance Associate role, a position for which both parties agree Plaintiff was qualified. (Reply to D-SOF ¶ 79.) An ETS recruiter passed Plaintiff's resume along to Jane Borden, hiring manager for the position, along with the resumes of two other applicants: Sade Peterkin and DeAndrea Hall. (Resp. to D-SOF ¶¶ 80–81.) With a colleague, Ms. Borden interviewed both Ms. Peterkin and Ms. Hall, but not Plaintiff. (Resp. to D-SOF ¶ 82.) Ms. Borden testified that she decided to interview Ms. Peterkin and Ms. Hall first because their salary grades were close to that of the Corporate Governance Associate position, while Plaintiff's salary grade was much higher. (Borden Dep. 43:16–19, 46:9–21, 49:15–50:1, 56:11–14 (Ms. Borden testifying that the open position was a salary grade 8, Ms. Peterkin was a salary grade 7, Ms. Hall was a salary grade 8, and Plaintiff was a salary grade 12).) In particular, Ms. Borden was "excited to offer [Ms. Peterkin] the opportunity for a promotion," as opposed to what would clearly be a marked demotion for Plaintiff. (*Id.* 46:9–21.) However, Ms. Borden testified that if neither of the other two candidates were suitable, she would have proceeded to interview Plaintiff. (Resp. to D-SOF ¶ 92.)

After the two interviews, Ms. Borden selected Ms. Peterkin for the position. (D-SOF ¶ 83.) Ms. Borden testified that she selected Ms. Peterkin for several reasons: (1) Based on the interview, she found Ms. Peterkin to be qualified, eager, and hungry for a role that would have been a promotion for her; (2) Ms. Borden believed following the interview that Ms. Peterkin would be able to effectively keep confidential information confidential; and (3) Ms. Borden was impressed with Ms. Peterkin's work ethic, citing her pursuit of a master's degree while working at ETS full time. (D-SOF ¶¶ 84–87.) Ms. Borden testified that, although the Corporate Governance Associate position's job description required eight or more years of experience, Ms. Peterkin—who had seven years of experience—was still the top candidate following the interview. (D-SOF ¶ 93; ECF No. 44-5 at Ex. 34.) Ms. Borden testified that she was unaware of Plaintiff ever having made complaints of discrimination to anyone at ETS, and nobody at ETS "told Ms. Borden not to hire Plaintiff for the Corporate Governance Associate Position." (D-SOF ¶¶ 94, 96; Resp. to D-SOF ¶¶ 94, 96.)

*c. Director Product Management*

Also on November 2, 2023, Plaintiff applied to ETS's Director Product Management role. (Resp. to D-SOF ¶ 79.) Max Chanoch, formerly an Associate Vice President of Product, was the hiring manager for this role. (Resp. to D-SOF ¶ 97.) Mr. Chanoch worked with a recruiter to pare down the number of resumes for his review, with the recruiter sending him applicants based on specified criteria—namely, "commerce-related functionality related to a product checkout cart." (D-SOF ¶ 99; Resp. to D-SOF ¶ 99; Chanoch Dep. 22:7–27:7, 35:10–38:7.) Mr. Chanoch had never heard of or met Plaintiff before or as part of the selection process, and had no recollection of ever reviewing her resume, which he presumed was the result of the recruiter screening process. (Chanoch Dep. 35:10–38:7.) Mr. Chanoch selected Giuseppe Arlia for the role based on his

decade-plus of experience in commerce-related product management, including "check-out" e-commerce work. (Reply to D-SOF ¶ 102; ECF No. 44-5 at Ex. 40.)

*d. Executive Director, Product Line Manager*

Finally, also as part of her November 2, 2023 applications, Plaintiff applied to the Executive Director, Product Line Manager role. (Resp. to D-SOF ¶ 79.) Ayan Basu, whom Plaintiff did not know and had never interacted with, was the hiring manager for this position. (Resp. to D-SOF ¶¶ 104–05.) Neither party deposed Mr. Basu. The only relevant facts in the record with respect to this position are ETS's amended responses to Plaintiff's first set of interrogatories—as set forth by a Mary Ruffner, a Human Resources Business Partner—and the job description itself. (ECF No. 44-5 at Exs. 19, 36.) Per these interrogatory responses, Plaintiff was not selected for the role because "the hiring manager for the role [Mr. Basu] needed deep digital product management experience for this role, which Plaintiff lacked."[18] (ECF No. 44-5 at Ex. 19 ¶ 10.) Plaintiff disputes that she did not have these qualifications given her background in product management and artificial intelligence business from her previous role. (Resp. to D-SOF ¶¶ 106–07.) Brad Bazemore was hired for the role, with his resume indicating extensive "SaaS" (software as a service) experience. (Resp. to D-SOF ¶ 108; ECF No. 44-5 at Ex. 41.)

4. <u>Plaintiff's Salary Compared to Other Executive Directors</u>

Plaintiff's final allegations are that two male Executive Directors (the same title as Plaintiff) within her organization—Matthew Welsher and Peter Yeager—received higher

[18] Plaintiff contends in her response to Defendant's statement of facts that these interrogatories are inadmissible hearsay and should not be considered by the Court. (Resp. to D-SOF ¶¶ 106–07.) Plaintiff misapprehends the standard at summary judgment: Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000). Accordingly, because Mr. Basu could testify to this evidence at trial, the Court will consider it as part of the record.

compensation than she did despite performing substantively similar or equal work. (Resp. to D-SOF ¶ 146.) Mr. Welsher was promoted to the Executive Director title in August 2022. (Resp. to D-SOF ¶ 160.) Per Mr. Nelson,[19] Mr. Welsher was one of two employees with primary responsibility for managing ETS's College Board contract. (Resp. to D-SOF ¶¶ 147, 150.) This contract generated approximately $340 million for ETS. (Resp. to D-SOF ¶ 148.) Mr. Nelson averred that this College Board contract was "incredibly complex, requiring many ETS employees who worked on it to be on call around the clock 24/7." (ECF No. 44-4 ¶ 5; Nelson Dep. 51:20–54:19.) Mr. Welsher's role was to manage the operations side of this contract to ensure smooth delivery of all scoring and score reporting for the various College Board assessments. (Resp. to D-SOF ¶ 150.)

As a military veteran and former congressional staffer, Mr. Yeager worked in ETS's Government Relations function. (Resp. to D-SOF ¶¶ 151–52.) Previously, Mr. Yeager had worked on ETS's "Praxis" business, a series of nationwide teacher certification exams, which generated average annual revenue of $50 million from 2019 and 2022. (D-SOF ¶¶ 153–54; Resp. to D-SOF ¶¶ 153–54.) Mr. Nelson testified that Mr. Yeager was then transferred to the Government Relations function in October 2022, where "he was tasked with procuring government contracts with foreign countries throughout the world to provide education-based services." (ECF No. 44-4 ¶ 8.) This required Mr. Yeager to meet with foreign officials responsible for their nations' education and representing ETS at the Education World Forum. (Resp. to D-SOF ¶ 157.)

---

[19] Plaintiff's objection to the use of Mr. Nelson's declaration is misplaced. Rule 56(c)(4) allows a party to support or oppose a motion for summary judgment by affidavit or declaration made on personal knowledge, as Mr. Nelson's declaration is. Fed. R. Civ. P. 56(c)(4); (Nelson Decl. ¶¶ 1, 3–4, 6–7; *see also* Nelson Tr. 161:22–164:18 (testifying that he was aware of what people in his organization were doing on a day-to-day basis even if he did not directly supervise them).).

The parties do not dispute the relative salaries of Plaintiff, Mr. Welsher, and Mr. Yeager, noting that Mr. Welsher's promotion to Executive Director was on August 13, 2022 and Mr. Yeager's was on October 22, 2022:

| Effective Date | Plaintiff's Salary | Welsher's Salary | Yeager's Salary |
|---|---|---|---|
| 4/5/2014 | $ 163,874.00 | $ 97,550.00 | $ 134,849.00 |
| 4/4/2015 | $ 171,658.00 | $ 102,184.00 | $ 138,557.00 |
| 4/2/2016 | $ 179,554.00 | $ 107,038.00 | $ 141,667.00 |
| 4/1/2017 | $ 185,431.00 | $ 112,167.00 | $ 143,667.00 |
| 3/31/2018 | $ 190,304.00 | $ 115,815.00 | $ 145,164.00 |
| 10/31/2018 | $ 190,304.00 | $ 144,769.00 | $ 145,164.00 |
| 3/30/2019 | $ 199,819.00 | $ 147,936.00 | $ 148,211.00 |
| 10/12/2019 | $ 199,819.00 | $ 170,126.00 | $ 148,211.00 |
| 4/25/2020 | $ 179,746.00 | $ 154,507.00 | $ 135,826.00 |
| 9/26/2020 | $ 199,819.00 | $ 170,126.00 | $ 148,211.00 |
| 3/27/2021 | $ 205,814.00 | $ 175,230.00 | $ 152,657.00 |
| 8/28/2021 | $ 205,814.00 | $ 205,000.00 | $ 152,657.00 |
| 1/1/2022 | $ 214,064.00 | $ 211,150.00 | $ 157,237.00 |
| 8/13/2022 | $ 214,064.00 | $ 232,265.00 | $ 180,823.00 |
| 10/22/2022 | $ 214,064.00 | $ 232,265.00 | $ 220,000.00 |
| 12/31/2022 | $ 224,767.00 | $ 241,555.60 | $ 228,800.00 |
| 12/30/2023 | $ 224,767.00 | $ 251,217.82 | $ 237,952.00 |

(D-SOF ¶ 159.)[20] The parties likewise do not dispute the relative annual bonuses of Plaintiff, Mr. Welsher, and Mr. Yeager, with Mr. Welsher not receiving a bonus until 2019:

[20] This chart is identical to the one provided by the parties, with the only change being that "empty" cells have been replaced with the corresponding salary for the listed date. (*See* ECF No. 44-3.) As explained in Defendant's various uncontested exhibits, Plaintiff's final salaries were $214,064 for 2022 and $224,767 for 2023. (*See id.* at 8.)

| Effective Date | Plaintiff's Bonus | Welsher's Bonus | Yeager's Bonus |
|---|---|---|---|
| 3/14/2014 | $ 26,466.00 | $ - | $ 16,999.00 |
| 3/15/2015 | $ 15,120.00 | $ - | $ - |
| 12/18/2015 | $ 11,477.00 | $ - | $ 6,750.00 |
| 12/16/2016 | $ 16,120.00 | $ - | $ 8,000.00 |
| 12/15/2017 | $ 14,300.00 | $ - | $ 4,750.00 |
| 12/14/2018 | $ 18,300.00 | $ - | $ 8,550.00 |
| 12/13/2019 | $ 20,000.00 | $ 16,540.00 | $ 14,615.00 |
| 11/13/2020 | $ 11,490.00 | $ 8,057.00 | $ 4,447.00 |
| 12/10/2021 | $ 32,979.51 | $ 28,805.00 | $ 10,624.93 |
| 12/9/2022 | $ 30,569.00 | $ 22,550.00 | $ 19,800.00 |
| 12/8/2023 | $ 15,733.70 | $ 19,000.00 | $ 18,122.00 |

(D-SOF ¶ 162.)[21]

### B. Procedural Background

After Plaintiff was terminated from her previous role and rejected from the positions discussed above, she filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on January 29, 2024, checking "Sex" and "Retaliation" as her bases for discrimination. (Resp. to D-SOF ¶ 63; ECF No. 1-2.) The EEOC issued Plaintiff a "Notice of Right to Sue" regarding this charge on June 14, 2024, and Plaintiff filed the instant suit on September 12, 2024. (ECF No. 1-2; "Compl.," ECF No. 1.) Plaintiff's complaint contains three counts: (1) a count containing claims under Title VII of the Civil Rights Act of 1964 ("Title VII") for sex discrimination and retaliation in connection with "Defendant's treatment of her," (Compl. ¶¶ 115–21); (2) a count alleging Defendant's violation of the Equal Pay Act ("EPA") based on Plaintiff's unequal salary, (*id.* ¶¶ 122–28); and (3) a count containing claims under the New Jersey Law

[21] Based on the submitted data, Plaintiff's combined compensation is larger than both Mr. Welsher and Mr. Yeager from March 2014 until August 2022. (*See* D-SOF ¶¶ 159, 162.) Furthermore, at first glance, the combined pay between the parties is comparable *even after* all three held the "Executive Director" title, if not slightly larger for Plaintiff compared to Mr. Yeager in 2022. (*See id.* (sum of Plaintiff's final salary and bonus in 2022 was $255,336.20, while Mr. Yeager's was $248,600 and Mr. Welsher's was $260,555.60.).

Against Discrimination ("NJLAD") for sex discrimination and retaliation "in connection with Defendant's treatment of her," and for unequal pay, (*id.* ¶¶ 129–40). Defendant answered. (ECF No. 7.) This case then proceeded through discovery over the course of 2025 before Defendant filed the instant Motion in February 2026. (MSJ.) The instant Motion is ripe for decision.

* * *

To organize Plaintiff's sprawling, decades-long timeframe of claims, the Court has prepared the below non-exhaustive chart summarizing facts, persons, and claims:

| **Claim(s) Involved** | **Person(s) Involved** | **Description of Event**[22] | **Timing** |
|---|---|---|---|
| Hostile Work Environment (Title VII & NJLAD) | Former ETS HR employees Willa Thomas and TJ Elliot. | Ms. Thomas and Mr. Elliot told Plaintiff she needed a "coach for [her] appearance" or, as Plaintiff subjectively interpreted, a "fat coach." | May 2012. |
| Hostile Work Environment (Title VII & NJLAD) | Former ETS HR employee TJ Elliot. | Mr. Elliot did not discipline an employee that forged Plaintiff and Plaintiff's assistant's signatures, nor did he discipline an employee watching pornography at work. | Between 2005 and 2012, while Plaintiff was still in HR at ETS. |
| Hostile Work Environment, (Title VII & NJLAD) | Former ETS Chief Operating Officer Eddie Monteiro. | Mr. Monteiro communication with employees was "brash, abrasive, direct and unpolished." Mr. Monteiro "treated [Plaintiff] like dirt" and questioned her ability to do her job the first time they met. Mr. Monteiro made mocking comments about women's bodies, including Plaintiff. | Between Mr. Monteiro's hire in late 2021 early 2022 and his termination in September 2022. |

[22] The source of these descriptions—undisputed statements of fact, exhibits, deposition testimony, etc.—are noted above.

| | | | |
|---|---|---|---|
| Hostile Work Environment, (Title VII & NJLAD) | Former ETS Chief Operating Officer Eddie Monteiro. | Mr. Monteiro and other male colleagues were disruptive and rude toward Plaintiff and other women presenters during a pitch meeting Plaintiff organized. | May 2022. |
| Hostile Work Environment, Retaliatory Termination (Title VII & NJLAD) | Former ETS Chief Operating Officer Eddie Monteiro; Plaintiff's former supervisor Scott Weaver; Plaintiff's final supervisor Scott Nelson; HR personnel Rukshana Mazagonwalla, Justin Patterson, and Sara Lester; Former ETS General Counsel Sheree Johnson-Gregory. | Plaintiff testifies that she complained about Mr. Monteiro's conduct to Mr. Weaver, Mr. Nelson, Ms. Mazagonwalla, Mr. Patterson, and Ms. Lester. Ms. Johnson-Gregory testifies that she had only "gossipy" conversations with Plaintiff. Mr. Nelson, Mr. Weaver, Ms. Lester, and Ms. Mazagonwalla testify that they never discussed sex discrimination with Plaintiff in any way. | Unspecified. Mr. Weaver left ETS in May 2022 and Mr. Monteiro was terminated in September 2022. |
| Hostile Work Environment (Title VII & NJLAD) | Associate Vice President at ETS Rui Ferreira, also working under Plaintiff's supervisor Scott Nelson. | Mr. Ferreira was "very condescending" and "extremely rude" to Plaintiff, and would "totally disregard what [she was] saying and go to someone else." Mr. Ferreira was not "a bad guy in the beginning and then all of a sudden he became like a mini Eddie [Monteiro]." | Unspecified. |
| Hostile Work Environment, Retaliatory Termination (Title VII & NJLAD) | Associate Vice President at ETS Rui Ferreira; Plaintiff's final supervisor Scott Nelson; HR personnel Justin Patterson. | Plaintiff testifies that she complained about Mr. Ferreira's conduct to Mr. Nelson and Mr. Patterson. Mr. Nelson testifies that Plaintiff only complained about her working relationship with Mr. Ferreira, not sex discrimination. | Plaintiff asserts between May 2023 and August 2023. |

| | | | |
|---|---|---|---|
| Hostile Work Environment, Retaliatory Termination (Title VII & NJLAD) | Associate Vice President at ETS Rui Ferreira; Former ETS Employee Stephanie Canter, also in Scott Nelson's organization. | Plaintiff avers: "In or around early-September 2023, Stephanie Canter confirmed with me that she, too, had complained of sex discrimination to ETS management and to HR, including complaining about the sex-discriminatory behavior of Rui Ferreira." | Unspecified; Plaintiff was told September 2023. |
| Discriminatory Termination, Retaliatory Termination (Title VII & NJLAD) | Plaintiff's final supervisor Scott Nelson; Plaintiff's former subordinates DeAndrea Hall and Anne-Marie Garrity. | Plaintiff is terminated as part of a company-wide reduction in force. Mr. Nelson and Ms. Hall assume Plaintiff's work, with Ms. Hall reporting to Ms. Garrity. | Plaintiff received formal notice September 29, 2023. |
| Discriminatory Failure to Hire, Retaliatory Failure to Hire (Title VII & NJLAD) | Michelle Froah, Josh Orye. | Plaintiff is not selected for the Chief of Staff to the Global Chief Marketing Officer position. Ms. Froah testifies that she selected Mr. Orye based on his marketing and other experience. Ms. Froah was unaware of any reports made by Plaintiff. | October 2023. |
| Discriminatory Failure to Hire, Retaliatory Failure to Hire (Title VII & NJLAD) | Jane Borden, Sade Peterkin, DeAndrea Hall. | Plaintiff is not selected for the Corporate Governance Associate position. Plaintiff was qualified, but was not interviewed after Ms. Borden selected Ms. Peterkin for the position. Plaintiff was the third choice behind Ms. Peterkin and Ms. Hall because her salary grade was higher than those candidates' and the position's. | November 2023. |
| Discriminatory Failure to Hire, Retaliatory Failure to Hire | Max Chanoch, Giuseppe Arlia. | Plaintiff is not selected for the Director Product Management position. Mr. Chanoch testifies that he had never heard of or met | November 2023. |

| | | | |
|---|---|---|---|
| (Title VII & NJLAD) | | Plaintiff. Mr. Chanoch testifies that he selected Mr. Arlia because of Mr. Arlia's commerce-related product management and "check-out" e-commerce experience. | |
| Discriminatory Failure to Hire, Retaliatory Failure to Hire (Title VII & NJLAD) | Ayan Basu, Brad Bazemore. | Plaintiff is not selected for the Executive Director, Product Line Manager position. Defendant's interrogatories state that Plaintiff was not chosen because she did not possess "deep digital product management experience," motivating Mr. Basu's selection of Mr. Bazemore. | November 2023. |
| Unequal Pay (EPA & NJLAD) | Male Executive Directors in Plaintiff's Department: Matthew Welsher & Peter Yeager | The parties agree that Mr. Welsher and Mr. Yeager received larger wages than Plaintiff following their promotions to Executive Director in August 2022 and October 2022 respectively. Mr. Welsher worked on ETS's College Board contract and Mr. Yeager worked in ETS's Government Relations function. | August 2022 and October 2022 through December 2023. |

## II. <u>LEGAL STANDARD</u>

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Put another way, "[s]ummary judgment is designed . . . to assess whether a genuine issue of material fact exists and whether a trial is necessary." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may

affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding the existence of a genuine dispute of material fact, the Court views all facts and reasonable inferences in the light most favorable to the nonmovant and asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Fowler v. AT&T Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quoting *Anderson*, 477 U.S. at 251–52).

If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Turco v. City of Englewood*, 935 F.3d 155, 161 (3d Cir. 2019) (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)). "Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018); *see Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (emphasis in original)). Likewise, the movant may establish entitlement to judgment as a matter of law by showing that the plaintiff's evidence is insufficient to establish an essential element of his claim. This showing "necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

## III. DISCUSSION

As described below, the Court concludes that there are no genuine disputes of material fact with respect to any of Plaintiff's claims precluding summary judgment for Defendant. At the outset, however, the Court notes that substantially all of Plaintiff's Complaint violates Rule 8's prohibition on "shotgun pleading." *Church v. J. Ritter L. P.C.*, No. 23-1709, 2024 WL 1052159, at *6 (D.N.J. Mar. 11, 2024) (explaining that a failure to separate claims into different counts violates Rule 8); *Rowen v. City of Bayonne*, No. 07-4237, 2011 WL 13177564, at *2 (D.N.J. Mar. 29, 2011) (finding Rule 8 analysis applicable at summary judgment). Plaintiff's three "Count" complaint nests multiple, overlapping claims within each count. (Compl. ¶¶ 115–40 (pleading discrimination and retaliation claims within Title VII count, equal pay claims within EPA count, and discriminatory termination, retaliatory termination, and equal pay claims under NJLAD count).) Although Defendant did not raise these facial pleading deficiencies, the Court can assess a complaint's compliance with Rule 8 *sua sponte*. *See Church*, 2024 WL 1052159, at *6; *Rowen*, 2011 WL 13177564, at *2 (dismissing claims at summary judgment that violated Rule 8); *Bey v. U.S. Dep't of State*, 416 F. App'x 136, 138 (3d Cir. 2011) (explaining that district courts may dismiss complaints pursuant to Rule 8 *sua sponte*).

Plaintiff's non-specific, kitchen-sink pleading has made it difficult for the Court to discern precisely what combination of Title VII, EPA, and NJLAD claims she alleged in this lawsuit. *See Ibeh v. Toro*, No. 20-1184, 2023 WL 6331584, at *4 (M.D. Fla. July 27, 2023) ("At the summary judgment phase, shotgun pleadings wreak havoc on the courts. Shotgun pleadings prevent the Court and the opposing party from determining which claims are brought, whether they are legally cognizable, and what evidence might be relevant or in dispute." (cleaned up)), *aff'd* No. 23-13128, 2024 WL 2723253 (11th Cir. May 28, 2024). Nonetheless, because the issue was not raised by

Defendant and extending every courtesy to Plaintiff, the Court will assess Plaintiff's various claims on the merits as well.

### A. Discriminatory & Retaliatory Termination Under Title VII and NJLAD

Defendant seeks summary judgment on Plaintiff's sex discrimination and retaliatory termination claims under Title VII and NJLAD.[23] Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[] or national origin." 42 U.S.C.A. § 2000e-2(a).

Title VII discrimination and retaliation claims are analyzed under the three-step burden shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At step one, a plaintiff must "carry the initial burden under the statute of establishing a *prima facie* case of [unlawful] discrimination," or alternatively, a *prima facie* case of retaliation. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802).

At step two, if the plaintiff establishes a *prima facie* case, "the burden of *production* shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes*, 32 F.3d at 763 (quoting *McDonnell Douglas*, 411 U.S. at 802) (emphasis in original). This reason, however, "need not . . . actually motivate[] the [employment] decision," *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)), because "throughout this burden-shifting paradigm, the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at

---

[23] The Court analyzes these Title VII and NJLAD claims together. *See, e.g.*, *Konate v. Actalent, Inc.*, No. 23-4210, 2025 WL 289212, at *3 n.2 (D.N.J. Jan. 24, 2025) (sex discrimination analyzed together); *McKinley v. Princeton Univ.*, No. 22-5069, 2023 WL 8374486, at *5 n.6 (D.N.J. Dec. 1, 2023) (retaliatory termination analyzed together).

763. Moreover, the Third Circuit has described the employer's responsibility in the second-prong as a "light burden." *Id.*

If the employer meets its step-two burden, at step three, the burden shifts back to the plaintiff to demonstrate "by a preponderance of the evidence that the employer's explanation is pretextual." *Id.* A plaintiff may demonstrate pretext in two ways. *See Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80 (3d Cir. 2015). The plaintiff "must present some evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). As the Third Circuit has explained:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108–09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765). In applying this analysis, courts are cautious to not act as "'a super-personnel department' tasked with correcting unduly harsh employment actions." *Klimek*, 618 F. App'x at 80 (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)).

1. Prima Facie Case of Discrimination & Retaliation

*a. Sex Discrimination*

To establish a *prima facie* claim for sex discrimination in the reduction in force context, a plaintiff must show "(1) membership in a protected class; (2) qualification for the position; (3) an

adverse employment action; and (4) retention by the employer of similarly situated employees outside of the relevant protected class." *Anderson v. Boeing Co.*, 694 F. App'x 84, 87 (3d Cir. 2017) (citing *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294–95 (3d Cir. 1997)). Because Plaintiff is a woman who had no performance or qualification issues and had her position terminated, she satisfies the first three elements. (D-SOF ¶ 44.)

However, Plaintiff offers no support to show that "similarly situated employees outside of the relevant protected class" retained their jobs. *Id.*; (Opp. at 19–23.) In fact, Plaintiff's only reference to other employees not chosen in the reduction in force is in her argument that "out of the 25 total [employees] within Nelson's organization," only Plaintiff and Stephanie Canter—"two complaining females"—were chosen by Mr. Nelson for termination. (Opp. at 20–21.) Plaintiff makes no effort to identify those 23 other employees, including identifying any of them by sex, or argue, in this context, whether those retained colleagues "worked in the same area as Plaintiff, in approximately the same position."[24] *Ross-Tiggett v. Reed Smith LLP*, No. 15-8083, 2024 WL 1928176, at *18 (D.N.J. Apr. 30, 2024) (citing *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 249–50 (3d Cir. 2002)); *see also Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 723, 738 (E.D. Pa. 2015) (explaining, in the Age Discrimination and Employment Act context, that determining if establishing a retained employee as "similarly situated" is determined on a "case-by-case basis"). Without more, Plaintiff's evidence suggests only that 23 other employees working for Mr. Nelson were not chosen in the reduction in force, not that those 23 other employees were similarly situated to her, or the gender breakdown for those 23 employees. (Opp. at 20.)

---

[24] As discussed in greater detail below, the other Executive Directors in Plaintiff's group, Matthew Welsher and Peter Yeager, had vastly different job portfolios than Plaintiff and thus were not similarly situated, even if they held the same generic corporate title. (Resp. to D-SOF ¶¶ 146–48, 151–54.) Subtracting Mr. Welsher and Mr. Yeager, Plaintiff fails to identify any similarly situated male employees to satisfy this *prima facie* burden. (Opp. at 19–23.)

Given ETS's wholesale closing of the Corporate Strategy Department—a process that Plaintiff herself participated in, including her participation in facilitating the layoff of a woman employee just months before the RIF—it is infeasible that Plaintiff could identify another employee in this same area of work of roughly the same level. (D-SOF ¶¶ 28–32, 36; ECF No. 44-5 at Ex. 14 (email from Plaintiff laying off Alisha Pollard given that her previous work in corporate strategy had been "decentralized and greatly diminished").) Through the corporate restructuring, Plaintiff's position was eliminated and no one replaced her. (D-SOF ¶¶ 59–61.) What was left of Plaintiff's remaining duties in AIAST and budget-management work were distributed among her female subordinates and Mr. Nelson, her supervisor. (*Id.* (Plaintiff's female *subordinates*, DeAndrea Hall and Anne-Marie Garrity, assumed Plaintiff's remaining duties along with Mr. Nelson).) Indeed, Plaintiff acknowledges only two employees that performed similar work to her in Mr. Nelson's department, Ms. Hall and Ms. Garrity, both of whom were women and reported to Plaintiff. (Resp. to D-SOF ¶¶ 59–61; *see also* Borden Dep. 49:15–50:1, 56:11–14 (hiring manager testifying that Ms. Hall's salary grade was four levels below Plaintiff's).) Accordingly, because Plaintiff provides no facts to determine if an employee "similarly situated" to her was retained following the ETS layoffs, she fails to establish a *prima facie* case of sex discrimination under Title VII and NJLAD.[25]

---

[25] Mindful of the Third Circuit's "flexible" approach to this fourth *prima facie* element in the RIF context, the Court also concludes that Plaintiff does not state a *prima facie* discrimination claim under the traditional Title VII test. *See Pivirotto v. Innovative Sys, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999). In those typical Title VII and NJLAD cases, the fourth element requires a showing that the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination. *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013). There are simply no facts in the record that Scott Nelson—the only discussed decisionmaker in Plaintiff's termination—harbored any discriminatory animus; none of the alleged discriminatory conduct is attributable to Mr. Nelson, the actual decisionmaker. *Cf. Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (requiring non-decisionmaker to have "influenced or participated" in the decision to terminate if decisionmaker does not exhibit discriminatory animus). To the extent Plaintiff relies on the comments and conduct of Mr. Monteiro

*b. Retaliation*

To state a *prima facie* case of retaliation under Title VII and NJLAD, Plaintiff must show that "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001).

Plaintiff cannot establish a *prima facie* case of retaliation. Plaintiff argues that her termination came "directly on the heels" of complaints she made to "HR and management during the time period of approximately May-August 2023." (Opp. at 19.) First, the Court assesses Plaintiff's case with respect to her complaints about ETS's former Chief Operating Officer Eddie Monteiro. Plaintiff acknowledges that she never made a written complaint and that there are no written reports regarding her complaints about Mr. Monteiro. (Resp. to D-SOF ¶ 26.) Plaintiff asserts that she verbally complained about Mr. Monteiro engaging in sex discrimination to (1) Sara Lester, Rukshana Mazagonwalla, and Justin Patterson in the ETS HR department and (2) Scott Nelson. (Pl's Dep. 112:19–113:10; 200:5–7; 203:24–204:4; 205:25–206:7; 206:8–207:8.) ETS's former GC Sheree Johnson-Gregory also testified that she discussed Mr. Monteiro with Plaintiff, but only in a "gossipy" and informal way. (Johnson-Gregory Dep. 61:21–64:10, 131:17–138:3.) All other deposed parties either had no recollection of or affirmatively denied Plaintiff ever complaining to them in any regard about Mr. Monteiro's conduct, let alone complaining about sex

---

or Mr. Ferreira to support this discrimination, "[s]tray remarks by non-decisionmakers . . . are rarely given great weight [in discrimination cases], particularly if they were made temporally remote from the date of the decision." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995). Mr. Monteiro and Mr. Ferreira are not alleged to have had any involvement in Plaintiff's termination and, in Mr. Monteiro's case, his various comments predated Plaintiff's termination by more than a year. Accordingly, there is no evidence to show that Plaintiff's termination was caused by the supposed animus of Mr. Monteiro or Mr. Ferreira, let alone the actual decisionmaker Mr. Nelson. *Id.*

discrimination. (Nelson Dep. 120:21–121:11; Lester Dep. 69:16–77:19, 85:12–89:22; Mazagonwalla Dep. 74:23–81:4.)

Even crediting Plaintiff's uncorroborated, self-serving testimony that she complained about sex discrimination, such testimony is insufficient to demonstrate a causal link given the prolonged period between the alleged reports and Plaintiff's termination. With respect to Plaintiff's complaints about Mr. Monteiro, her testimony provides no specific timeframe for these various supposed disclosures. Mr. Monteiro was terminated in September 2022, putting the complaints—at the latest—a year out from Plaintiff's termination.[26] (D-SOF ¶ 124.) The Third Circuit has recognized that this sort of timing "weighs against a finding of a causal link" between the protected activity and the adverse employment action, particularly because Plaintiff marshals no independent facts to indicate retaliatory animus by ETS "during the intervening period."[27] *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five-month gap too long); *Carter v. Midway Slots & Simulcast*, 511 F. App'x 125, 130 (3d Cir. 2013) (eight-month gap too long); *Groeber v. Friedman*

---

[26] The only way Plaintiff's alleged complaints regarding Mr. Monteiro could have happened within a year of her termination was if she leveled sex discrimination complaints about him after he was fired in September of 2022, which of course makes no sense. This utterly illogical chronology—that Plaintiff complained about Mr. Monteiro when he was no longer with ETS—is not supported by the record.

[27] Similarly, any complaints made to Plaintiff's former supervisor, Scott Weaver, about unequal pay are not unduly suggestive for similar reasons. Mr. Weaver left ETS in May 2022, meaning any complaint Plaintiff would have made to him would have been at least 16 months before Plaintiff's termination. (Resp. to D-SOF ¶ 27.) Mr. Weaver had no recollection of a conversation about Mr. Monteiro and, more importantly, there is no evidence that anyone at ETS with the power to terminate Plaintiff (namely, Mr. Nelson) was aware of such a conversation. (Weaver Dep. 60:9–24.) Regardless, Plaintiff makes no mention of her alleged complaint to Mr. Weaver in her Opposition brief; thus, she forfeits such arguments. (*See generally* Opp.)

*& Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014) (three month gap not "unusually suggestive" of retaliatory motive).

Furthermore, Plaintiff's subsequent rejection from the other ETS positions she applied to in 2023—*after* being advised of her termination effective January of 2024—does not indicate a "pattern of antagonism" against Plaintiff "during the *intervening period*" of her alleged complaints and eventual termination. (Opp. at 20); *Shaner*, 204 F.3d at 505 (emphasis added); *see also Kriss v. Fayette County*, 827 F. Supp. 2d 477, 495 (W.D. Pa. 2011) ("[A] 'pattern of antagonism' to support causation refers to intervening antagonism between the time of the protected activity and the time of the alleged retaliatory conduct." (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007))). It is uncontested that none of the hiring managers for any of the ETS positions sought by Plaintiff following her termination had any awareness that Plaintiff allegedly complained of sex discrimination. (Resp. to D-SOF ¶¶ 77–78 (Michelle Froah unaware of reports of discrimination), 94, 96 (Jane Borden unaware of reports of discrimination), 104–05 (no evidence Ayan Basu knew who Plaintiff was); Chanoch Dep. 35:10–38:7 (Max Chanoch had never heard of or met Plaintiff).) Thus, Plaintiff cannot sustain a *prima facie* retaliation case based on her otherwise undocumented complaints about Mr. Monteiro.

Plaintiff's reliance on her alleged complaints about Rui Ferreira fares no better. Plaintiff alleges—again without any evidence of formal complaints, and without any details on timing or specifics on content—that she complained about Mr. Ferreira multiple times across May and August 2023 to Mr. Nelson and HR employee Justin Patterson. (Pl's Dep. 200:5–7, 208:16–210:1.) Specifically, Plaintiff testified that in her reports, she "gave examples of when we were in meetings and how [Mr. Ferreira] talks to [her,] and how he always talks down to [her]" in a "condescending way[,]" and that Mr. Ferreira was "extremely rude" to her. (Pl's Dep. 208:19–209:1.) Mr. Nelson

testified that while they spoke about problems with Mr. Ferreira and Plaintiff's working relationship, Plaintiff did not complain of sex discrimination—only that Mr. Ferreira was "slimy." (Nelson Dep. 112:9–116:1.) Mr. Patterson was not deposed.

Like her complaints about Mr. Monteiro, even if the Court were to credit Plaintiff's self-serving deposition testimony that she complained about Mr. Ferreira, Plaintiff cannot establish a *prima facie* case. To constitute a protected activity, the complaint must be specific, identifying the "illegal employment practice" complained of—"if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). Because federal courts are not "super-personnel [HR] department[s]," *Brewer*, 72 F.3d at 332, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII," *Curay-Cramer*, 450 F.3d at 135.

Here, Plaintiff's testimony about her reports of Mr. Ferreira—the only evidence in the record regarding these alleged conversations—are generalized, interpersonal complaints about Mr. Ferreira's communication style with her; they make no reference to sex discrimination, even by context. (Pl's Dep. 208:19–209:1 (Plaintiff testifying that she complained to both Mr. Nelson and Mr. Patterson about Mr. Ferreira's condescending and rude communication style).) Plaintiff does not cite to any portion of her deposition in which she explicitly testified that her complaints regarding Mr. Ferreira were about his purported *sex discrimination*. (Resp. to D-SOF ¶ 131; P-SSOF ¶ 9.) Plaintiff's alleged complaints about mean-spirited behavior or interpersonal friction are insufficient to state a *prima facie* retaliation claim where it is neither "explicitly or implicitly" alleged that her sex "was the basis for the adverse employment action." *Curay-Cramer*, 450 F.3d at 135 (quotation omitted); *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995). Instead, Plaintiff's sparse testimony about Mr. Ferreira is, at best, the kind of "oblique reference"

to discrimination where it "is impossible to judge whether [Plaintiff] reasonably believed [she] was protesting a violation of Title VII." *Perry v. Harvey*, 332 F. App'x 728, 733 (3d Cir. 2009). Accordingly, Plaintiff cannot make out a *prima facie* case of retaliation under Title VII and NJLAD.[28]

2. <u>Legitimate, Non-Discriminatory & Non-Retaliatory Reasons for Termination</u>

Assuming, *arguendo*, that Plaintiff sufficiently made a *prima facie* case of discriminatory or retaliatory termination, the burden then shifts to Defendant to articulate a legitimate, non-discriminatory, and non-retaliatory reason for its decision. *Fuentes*, 32 F.3d at 763. Defendant's stated reasons in response to both claims are the "indisputable economic realities" that ETS could no longer justify Plaintiff's position in the midst of a company-wide significant reduction in force. (MSJ at 16.) This RIF eliminated over 125 positions across Defendant, and Scott Nelson—Plaintiff's supervisor—testified that he was instructed to attempt to eliminate 5 to 10 percent of costs across his area of responsibility. (D-SOF ¶¶ 37–39, 45.) Mr. Nelson also articulated this reason at his deposition, stating that Plaintiff was terminated because her corporate strategy role "had largely gone away" and that her remaining AIAST work "could be absorbed by someone else." (Nelson Dep. 161:22–176:24.) Furthermore, in contemporaneous correspondence from August 2023 with Justin Patterson from ETS HR, Mr. Nelson provided this same reasoning. (ECF No. 44-5 at Ex. 17 ("Denise was previously ED of corp. strategy. The corporate strategy office no

[28] The only facts in the record to suggest that anyone complained about *sex discrimination* by Mr. Ferreira is Plaintiff's declaration attesting that her *colleague*, Stephanie Canter did so. (ECF No. 45-7 ¶ 1.) Plaintiff may only rely on Ms. Canter's alleged report of discrimination to sustain her own retaliation claim if she can show that "injuring [Plaintiff] was the employer's means of harming [Ms. Canter]." *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011); *DeSantis v. N.J. Transit*, No. 14-3578, 2017 WL 5050039, at *9 (D.N.J. Nov. 3, 2017) (dismissing Title VII claim at summary judgment where plaintiff failed to adduce facts showing they were in "zone of interest" of other's report of discrimination). There is no evidence in the record to suggest that Ms. Canter's termination was meant to "punish" Plaintiff, meaning Plaintiff may not rely on Ms. Canter's supposed report to sustain her own retaliation claim.

longer exists and Denise's other responsibilities leading the AIAST business unit do not justify a full time leader at her level."); ECF No. 44-5 at Ex. 18 (HR spreadsheet showing same reasoning).)

As discussed above, the reduction in overall corporate strategy work at ETS is consistent with the broader record. ETS's new CEO in mid-2022 was more directly involved in corporate strategy work. (Resp. to D-SOF ¶¶ 30–31.) The Corporate Strategy Department was no longer listed on an internal ETS organizational chart. (Pl's Dep. 147:9–148:16; ECF No. 44-5 at Ex. 13.) Crucially, in May 2023, Plaintiff herself effectuated the closing of the "corporate strategy cost center," and facilitated the termination of a female corporate strategy analyst because much of her previous corporate strategy work had been—in Plaintiff's own words at the time—"decentralized and greatly diminished." (D-SOF ¶ 36; Resp. to D-SOF ¶ 36; ECF No. 44-5 at Ex. 14.) Moreover, AIAST was a relatively small business unit in the overall scheme of ETS's work, with gross profit margins around $1.6 to 1.7 million from 2022 to 2024. (Resp. to D-SOF ¶¶ 13, 15–16; Weaver Dep. 31:12–19; Nelson Dep. 35:17–36:10; *see also* D-SOF ¶ 43 (ETS's College Board contract estimated at $340 million).) This AIAST work could be and was subsequently distributed amongst Plaintiff's existing subordinates; nobody was hired to replace Plaintiff's position. (D-SOF ¶ 59; Resp. to D-SOF ¶ 59.)

Clearly, Defendant has adequately propounded a legitimate, non-discriminatory and non-retaliatory reason for ETS's strategic, business decision. *See, e.g.*, *Sandusky v. HDH Grp., Inc.*, No. 18-386, 2019 WL 6312242, at *4 n.5 (W.D. Pa. Oct. 8, 2019) (collecting cases on permissibility of a reduction in force as a legitimate reason for employment decision). While it is undeniably unfortunate that Plaintiff would be terminated after two decades of productive and meaningful service for non-performance reasons, the economic realities behind Defendant's

business decision to terminate Plaintiff are precisely the sort of reasons courts consistently recognize at this step of *McDonnell Douglas*. *Id.*

3. <u>Pretext</u>

The burden thus shifts back to Plaintiff to demonstrate pretext. At the summary judgment stage, this burden requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)); *see also Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (explaining that plaintiff's final burden requires proving that "the protected status of the plaintiff was the *determinative factor* of the adverse employment action" (emphasis added)).

Plaintiff's argument in her opposition that Defendant's above reasons are pretextual are that (1) the only two members of Scott Nelson's 25-person organization terminated in the reduction in force were Plaintiff and Stephanie Canter, "the only two" complaining females in that organization, (2) Defendant (and Scott Nelson specifically) "failed to provide any explanation as to why [Plaintiff] (or her position), . . . was being eliminated, as opposed to other male and/or non-complaining employees (or their positions)," and (3) "[t]here is an extraordinary lack of documentation surrounding Nelson's" decision to terminate Plaintiff and Ms. Canter. (Opp. at 20–23.)

Each of Plaintiff's arguments fail to discredit Defendant's legitimate reasons or suggest that an invidious reason was instead the determinative cause of Plaintiff's termination. *Tourtellotte*, 636 F. App'x at 842. First, to the extent Plaintiff relies on Stephanie Canter's alleged

reports regarding Rui Ferreira's sex discrimination—which in the entirety of the voluminous record consists of but a single sentence in Plaintiff's own declaration—this purported evidence is likely not admissible. (ECF No. 45-7 ¶ 1.) The Third Circuit has made clear that so-called "me too" evidence—evidence of discrimination against other employees—is not per se admissible or inadmissible in an employment discrimination case unless the facts show that those other instances of alleged discrimination are "closely related . . . to the plaintiff's circumstances and theory of the case." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To avoid the potential for prejudicial and irrelevant evidence under Federal Rules of Evidence 401, 403 and 404, the Court must undertake a "fact-intensive, context-specific inquiry" to determine if such evidence is admissible to show discriminatory intent—as opposed to inadmissible propensity evidence of the defendant's previous bad acts. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n.8 (3d Cir. 2000); *Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 228 (3d Cir. 2008); *see Graham v. Monmouth Cnty. Buildings & Grounds*, No. 16-1578, 2020 WL 3923921, at *3 (D.N.J. July 10, 2020) (discussing relevant factors part of fact-intensive inquiry) (citing *Barnett v. Pa Consulting Grp., Inc.*, 35 F. Supp. 3d 11, 22 (D.D.C. 2014)).

Plaintiff's bare-bones, skeletal, "throw it against the wall and see what sticks" single sentence assertion plainly does not allow for this requisite "fact-intensive" inquiry into the nature of Ms. Canter's complaints. *Sprint/United Mgmt. Co.*, 552 U.S. at 388. The entirety of the evidence regarding Ms. Canter's so-called complaints—per Plaintiff's own supplemental statement of facts—comes entirely from Plaintiff's own, self-serving declaration: "In or around early-September 2023, Stephanie Canter confirmed with me that she, too, had complained of sex discrimination to ETS management and to HR, including complaining about the sex-

discriminatory behavior of Rui Ferreira." (P-SSOF ¶ 1; ECF No. 45-7 ¶ 1.) This uncorroborated assertion does not identify with any specificity, among other things, (1) the circumstances of Ms. Canter's alleged discriminatory experiences with Mr. Ferreira, (2) how the reports were received or reacted to by ETS employees, (3) the format, quantity, or dates of these complaints and (4) to whom in "ETS management and to HR" she complained. (*Id.*) There is simply no context regarding Ms. Canter's alleged complaints to support their admission for a permissible purpose—virtually nothing to show how "closely related" Ms. Canter's complaints were to Plaintiff's. *Mandel*, 706 F.3d at 167. In fact, the only other evidence in the record regarding Ms. Canter's alleged complaints comes from Scott Nelson, who testified that he "recall[ed] a conversation that Stephanie [Canter] and I had where she had broad concerns about her future at ETS and some concerns about coworkers," but specifically did not "remember a complaint about Rui." (Nelson Dep. 94:4–22.) Accordingly, the skeletal record before the Court on this point does not permit it to infer admissibility and find pretext.[29] *See Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (finding the District Court's non-consideration of inadmissible pretext evidence proper at summary judgment).

Moreover, Plaintiff also argues that Defendant failed to provide her, to her satisfaction, a personal explanation regarding the bases for her termination at the time. (Opp. at 21–22.) While not providing a terminated employee the reasons for their termination may not be an optimal or preferred way to conduct business from the vantage of the employee, Plaintiff has not cited any

---

[29] For similar reasons, the Court will not consider evidence regarding the alleged sex discrimination and retaliation against another former ETS employee, Joanne Gorin. (*See* Opp. at 21–22.) Construing the largely collateral facts regarding Ms. Gorin's departure most favorably to Plaintiff, Ms. Gorin (1) complained about inappropriate language in a colleague's email in August 2021, (2) HR directed that employee to apologize for the email, and (3) Mr. Gorin was terminated thirteen months later, in September 2022. (Gorin Dep. 17:19–25, 112:10–123:14.) The circumstances of this report, response, and termination—wholly unrelated to the layoffs at issue that happened a full year later—are in no way the sort of "similar circumstances" that justify the consideration of this highly prejudicial propensity evidence. *Graham*, 2020 WL 3923921, at *4.

legal support or ETS policy to suggest that such a corporate practice indicates pretext.[30] (*Id.*); *cf. Kiesewetter v. Otis Elevator Co.*, 183 F. Supp. 3d 656, 659 (E.D. Pa. 2016) (explaining that plaintiff can show "the employer deviated from its normal policies and procedures for a layoff" to show pretext).

Furthermore, the record plainly indicates that in August 2023—*before* the layoff was effectuated—Scott Nelson, in writing, set forth the bases for Plaintiff's termination to Justin Patterson in HR: "The corporate strategy office no longer exists, and [Plaintiff's] other responsibilities leading the AIAST business unit do not justify a fully time leader at her level." (ECF No. 44-5 at Ex. 17; ECF No. 44-5 at Ex. 18). Mr. Nelson's justification is not post-hoc; it has remained consistent since August 2023, even if he did not advise Plaintiff personally and directly in September 2023. (*See* Nelson Dep. 161:22–176:24 ("I was making a decision about the role that she occupied, and the role of that job was – no longer could be justified as an executive director role. Her strategy role had largely gone away, and the role of AIAST could be absorbed by somebody else.").) Because Mr. Nelson's reasoning remained consistent, and he had no obligation to provide Plaintiff with that reason at the time, Plaintiff's argument fails to demonstrate

---

[30] Similarly, Plaintiff's assertion that Scott Nelson's decision to select her and Stephanie Canter in the layoff was based on "inconsistent criteria" mischaracterizes the record. (Opp. at 21.) Mr. Nelson's stated reason for dismissing Ms. Canter—her not "producing big contracts" for her team and general organizational structure reasons—while *different* from the reason for terminating Plaintiff, is not *inconsistent* with that reason. (*See* ECF No. 44-5 at Ex. 18 ("[Ms. Canter] does not support EAS work and is currently supporting K12 work. However, the K12 organization is unable to transfer the incumbent in."); Nelson Dep. 177:1–178:2 (testifying that Ms. Canter was "not producing big contracts" on the K-12 team sufficient to justify her continuing in business development).) With respect to Plaintiff, there is no evidence in the record that Mr. Nelson or Defendant ever wavered in their justification for terminating Plaintiff, or that ETS policy compelled them to consider other factors before eliminating her position. *Cf. Kiesewetter v. Otis Elevator Co.*, 183 F. Supp. 3d 656, 659 (E.D. Pa. 2016) (explaining that plaintiff can show "the employer deviated from its normal policies and procedures for a layoff" to show pretext). To the extent Plaintiff argues that Defendant should have applied some other set of criteria in determining who to layoff, Plaintiff cannot show pretext by arguing that ETS's decision was "wrong or mistaken." *Keller*, 130 F.3d at 1109.

pretext.[31] *See Leung v. SHK Mgmt., Inc.*, No. 98-3337, 1999 WL 1240961, at *11 (E.D. Pa. Dec. 21, 1999) ("Mr. Leung has directed the Court to no authority, and the Court is aware of none, which suggests that an employer is under an obligation to inform the employee of the reason for his termination and that an employer's failure to do so is evidence of unlawful discrimination. Defendant's alleged failure to inform Mr. Leung of why he was no longer needed by the company is not, on the record before the Court, evidence of pretext.").)

Plaintiff's final argument of pretext—the "extraordinary lack of documentation surrounding Nelson's termination decisions"—fails for similar reasons. (Opp. at 22 (citing *Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017)).) Plaintiff's assertion that "[t]here are essentially no documents" regarding the "factors/criteria" Mr. Nelson used in making his decision to lay off Plaintiff in September 2023 ignores the contemporaneous correspondence that he provided Justin Patterson and the HR justification spreadsheet circulated in August 2023. (ECF No. 44-5 at Ex. 17; ECF No. 44-5 at Ex. 18.) Indeed, Plaintiff's argument is belied by her own involvement in the layoff of a female colleague in May

[31] Relatedly, Plaintiff argues that Defendant "has failed to provide any explanation as to why Plaintiff was not offered the positions of either of her two non-complaining, less experienced direct reports who were retained without explanation – or at least why Plaintiff was not even considered for those positions" or why "Plaintiff was not considered for the positions that took over her responsibilities." (Opp. at 22.) As an initial matter, to the extent Plaintiff proposes some alternative approach to layoffs from the one ETS undertook, such second-guessing of Defendant's business judgment does not support a finding of pretext. *Keller*, 130 F.3d at 1109 ("[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." (second alteration in original) (internal quotation marks omitted)). Plaintiff, again, offers no legal support for Defendant's supposed obligation to explain itself to her, nor does she offer support for its decision to structure its layoff one way versus another. (Opp. at 22.) What is more, Defendant's decision to consolidate Plaintiff's work amongst her remaining subordinates and others is entirely consistent with its stated economic justification for her termination; it could still cover her diminished corporate strategy and AIAST work with existing employees but no longer needed to pay her significant salary. (Resp. to D-SOF ¶¶ 59–61.)

2023—mere months prior to her own termination—for substantially the same reason: cost-cutting economics. (D-SOF ¶ 36; Resp. to D-SOF ¶ 36; ECF No. 44-5 at Ex. 14.)

Although Plaintiff may believe that more stringent and mandated documentation is preferable, she points to no legally required quantum of paperwork before a corporation can effectuate a RIF. Further, unlike Plaintiff's out-of-district, non-precedential cited cases in which *no* documentation was prepared by the defendant-employer in connection with the layoff, this case includes pre-termination documentation that set forth the bases of Plaintiff's termination which has remained consistent throughout. (*Id.*); *see Eliason v. Allied Universal Sec. Servs.*, No, 24-2534, 2026 WL 2018650, at *8 (E.D. Pa. July 13, 2026) (distinguishing *Johnson* and other cases where there are "*no* contemporaneous internal documents" regarding a layoff with one where there is contemporaneous documentation (cleaned up) (emphasis in original)). Plaintiff's argument that the "[l]ack of *additional* documentation under these circumstances is not a basis to infer pretext." *Lynn v. Bank of N.Y. Mellon*, No. 22-4655, 2025 WL 907898, at *12 (D.N.J. Mar. 25, 2025) (emphasis in original) (further distinguishing *Johnson*).

In short, in addition to failing to state *prima facie* discrimination and retaliation claims, Plaintiff fails to indicate any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," and she presents no evidence from which a reasonable juror could find that discriminatory animus was more likely than not a determinative factor in her termination.[32] *Fuentes*, 32 F.3d at 765. Plaintiff's

[32] Both Plaintiff's NJLAD and Title VII claims may also proceed under a "mixed-motive" framework as articulated by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Myers v. AT&T*, 882 A.2d 961, 968 (N.J. Super. Ct. App. Div. 2005) (NJLAD); *Greenawalt v. Clarion County*, 459 F. App'x 165, 168–69 (3d Cir. 2012) (Title VII). "In order to trigger a mixed-motive framework, 'a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [a protected characteristic] was a motivating factor for any employment practice.'" *Tolan v. Temple Health Sys. Transp. Team, Inc.*, 557 F. App'x 132, 138 (3d Cir. 2014) (alteration in original)

understandable disappointment and regret, however genuine, are not actionable without more under Title VII or NJLAD. The record fails to provide any basis to second-guess ETS's sterile, neutral economic justifications for her termination, and it is not the providence of the Court to act as "a super-personnel department." *Brewer*, 72 F.3d at 332.

### B. HOSTILE WORK ENVIRONMENT UNDER TITLE VII AND NJLAD

Next, the Court turns to Plaintiff's hostile work environment claims under Title VII and NJLAD.[33] (Compl. ¶¶ 87, 105, 111, 113.) "To succeed on a hostile work environment claim [against the employer], the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel*, 706 F.3d at 167. Courts must assess the record as a whole to determine if there is evidence of a hostile work environment at summary judgment. *Cardenas v. Massey*, 269 F.3d 251, 260–61

---

(emphasis omitted) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Although Plaintiff does not affirmatively raise this theory in her briefing for either claim, the Third Circuit has stated that district courts are nonetheless "required to determine whether a *Price Waterhouse* analysis is legally applicable" even if not raised at summary judgment. *Magnusson v. The Hartford*, 258 F. App'x 444, 446 n.3 (3d Cir. 2007). Because "[t]he record before [the Court] is bereft of direct evidence strong enough to mandate a mixed motive analysis," or to create a triable issue of fact under such an analysis, neither of Plaintiff's claims survive summary judgment on this alternative theory. *Id.* at 447. Plaintiff has not presented any evidence to suggest that "a discriminatory attitude was more likely than not a motivating factor" for her termination, and none of her evidence is "connected to the decision being challenged by the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting and citing *Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 513, 515–16 (3d Cir. 1997)); *see also Tolan*, 557 F. App'x at 138 (holding that district court's decision to "decline[] to analyze the facts of this case using a mixed-motive rubric" was appropriate where plaintiff offered limited evidence of discrimination). Accordingly, under either framework, Plaintiff's claims must still be dismissed.

[33] Hostile work environment claims under NJLAD and Title VII are analyzed concurrently. *See, e.g.*, *Richardson v. State of N.J. Office of the Att'y Gen.*, No. 16-5711, 2020 WL 13819830, at *8 n.12 (D.N.J. Jan 31, 2020) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999)).

(3d Cir. 2001). The standard for a hostile work environment claim is "demanding." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

1. Plaintiff Fails to State a Hostile Work Environment Claim

Assessing the record as a whole, Plaintiff fails to meet this "demanding" standard on both elements one and two. *Id.* Fatally, Plaintiff fails to establish that she suffered intentional discrimination "because of [her] sex." *Mandel*, 706 F.3d at 167. Plaintiff's testimony about various incidents involving other male employees at ETS when she was in the HR department in 2012—an employee forging her signature and another watching pornography—does not suggest that these experiences had anything to do with her sex. (Resp. to D-SOF ¶ 143; Pl's Dep. 255:13–256:18.) Her offense about the long-ago incidents had more to do with her perceived insult that her recommendations that the conduct warranted both employees be terminated was not heeded. (*Id.*) At this same time in 2012, another woman in the HR department telling her she needed a "coach for [her] appearance," which Plaintiff construed was about her weight, "bears no relation to her protected status as a female." *Dalton v. New Jersey*, No. 17-4094, 2018 WL 305326, at *9 (D.N.J. Jan. 5, 2018); *see also Czerwinski v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 394 F. Supp. 3d 210, 220–21 (N.D.N.Y. 2019).

Plaintiff's testimony regarding Eddie Monteiro and Rui Ferreira also fails to show "that she suffered intentional discrimination *because of her [sex]* . . . in order to establish a hostile work environment claim."[34] *Lacy v. Nat'l R.R. Passenger Corp.*, 254 F. App'x 934, 936 (3d Cir. 2007) (emphasis added); *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("It is axiomatic

[34] While Defendant arguably did not separate out its argument as to the first element of these claims, the Court concludes that it sufficiently raised and disputed that Plaintiff's claims regarding Mr. Monteiro and Mr. Ferreira were "because of gender sex," and thus failed to satisfy the first element of a *prima facie* case for a hostile work environment. ( *See* MSJ at 29, 31.)

that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." (cleaned up)). Nowhere in Plaintiff's deposition does she suggest that Mr. Ferreira's "very condescending" tone and "extremely rude" behavior was directed at Plaintiff because of her sex. (Pl's. Dep. 207:15–24); *Lacy*, 254 F. App'x at 936; *Dalton*, 2018 WL 305326, at *9; *Alfano*, 294 F.3d at 374.

Further, Mr. Monteiro's "brash, abrasive, direct and unpolished" style and alleged comments do not rise to the level of sex-based animus. (D-SOF ¶ 120). Plaintiff's generalized allegations that Mr. Monteiro "treated [her] like dirt," engaged in petty name-calling of her and other ETS employees, and made mocking comments about Plaintiff and other women's weight are not sufficiently "facially sex-related" to establish the first element of this claim.[35] (Pl's Dep. 204:12–205:17, 242:8–13); *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 52 (2d Cir. 2014). Rudeness, even about a female employee's weight, is not per se discrimination, let alone evidence of sex discrimination. *Czerwinski*, 394 F. Supp. 3d at 220–21 (holding that off-handed comments about weight and appearance do not suggest gender animus and collecting cases); *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-9234, 2010 WL 3932354, at *14 (S.D.N.Y. Sept. 29, 2010) (granting summary judgment where comments directed at plaintiff calling her a "fat ass" were "certainly rude" but were "gender neutral statements that do not indicate gender animus"). Plaintiff's collective testimony in support of this claim fails to show that "she suffered intentional discrimination because of her [sex]." *Lacy*, 254 F. App'x at 936.

[35] To the extent Plaintiff relies on Eddie Monteiro's allegedly disruptive conduct at the May 2022 "Big Idea" presentation to show sex-based animus, the record demonstrates that it was actually *Plaintiff's* seating chart that created the allegedly sexist "optic[s]" of the event and assorted complaints to HR. (Pl's Dep. 179:25–187:23; ECF No. 44-5 at Ex. 12; Lester Dep. 114:7–115:6.)

Even if Plaintiff could connect these generalized abrasive comments and experiences to her sex, they do not satisfy the "severe and pervasive" element of a hostile work environment claim. *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017) ("The 'severe or pervasive' standard requires conduct that is sufficient to alter the conditions of the employee's employment and create an abusive working environment." (cleaned up)). Boorish and crass conduct—without more—is not actionable under Title VII and NJLAD. *Id.* (explaining that "mere offensive utterance[s]" insufficient for hostile work environment claim); *Faragher*, 524 U.S. at 788 (explaining that Title VII is "not a general civility code"); *Abramson*, 260 F.3d at 280 (explaining that "mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment," does not suffice for a hostile work environment claim (quoting *Faragher*, 524 U.S. at 787)).

Plaintiff's smattering of allegations about her time in the HR department, Mr. Monteiro, and Mr. Ferreira are precisely the sort of "offhanded comments[] and isolated incidents (unless extremely serious)" that "are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher*, 524 U.S. at 788); *see Semsroth v. City of Wichita*, 304 F. App'x 707, 727 (10th Cir. 2008) (concluding that frequent "derogatory remarks about [a plaintiff's] weight and her eating habits . . . [though] unpleasant," could not support hostile work environment claim at summary judgment); *Grassmyer v. Shred-It USA, Inc.*, 392 F. App'x 18, 25, 30 (3d Cir. 2010) (holding that defendant "regularly [making] comments about the size of his genitalia and about the intimate details of his sexual relationships" and referring to women as "bitches" did not rise to the level of "severe or pervasive" harassment). Plaintiff's allegations do not suggest a pattern of "physically threatening or humiliating conduct" that fundamentally altered her work environment at ETS in a persistent and

pervasive way. *Moody*, 870 F.3d at 214 (quoting *Clark Cnty. Sch. Dist v. Breeden*, 532 U.S. 268, 270–71 (2001)); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (reserving hostile work environment claims for "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment."). Accordingly, Plaintiff has failed to demonstrate genuine disputes of material fact precluding summary judgment on her hostile work environment claims.[36]

2. Continuing Violation Doctrine

Although the entirety of Plaintiff's proffered evidence fails to state a hostile work environment claim, much of this evidence is also time-barred. In "deferral" states such as New Jersey, a plaintiff must first file a Title VII complaint with the EEOC "within 300 days of the alleged discrimination," with claims outside of that period being time-barred. *Scrutchins v. New Jersey*, No. 12-5855, 2014 WL 6991908, at *5 (D.N.J. Dec. 10, 2014). Hostile work environment claims under NJLAD are subject to a two-year statute of limitations. *Anderson v. Thermo Fisher Sci.*, No. 11-3394, 2013 WL 1222738, at *5 (D.N.J. Mar. 25, 2013).

Based on these time constraints, only Plaintiff's allegations of harassment occurring on or after April 5, 2023 are timely as part of her Title VII claim (300 days after Plaintiff's EEOC charge) and those occurring on or after September 12, 2022 (two years before the filing of her complaint) are timely as part of her NJLAD claim. (D-SOF ¶¶ 63–65; Compl.) As such, Plaintiff cannot rely

[36] To the extent Plaintiff attempts to make out *retaliatory* hostile work environment claims, these claims independently fail. (Opp. at 15–16.) Plaintiff in no way connects her asserted facts regarding Mr. Monteiro and Mr. Ferreira to "her protected activity"—her alleged reports to Defendant—or how, as a result of those protected activities, she began to experience "severe or pervasive" discrimination. *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019), *partially abrogated on other grounds*, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). Plaintiff offers no facts to show that the various "hostile" experiences she had at ETS were at all connected to her reports of discrimination, or that Mr. Ferreira or Mr. Monteiro knew of the reports at all. Accordingly, summary judgment is likewise appropriate on these claims.

on substantially all of her allegations to support her claim. Plaintiff's experiences in the ETS HR department occurred, at the latest, in 2012, when Plaintiff left that department. (D-SOF ¶¶ 142−43; Resp. to D-SOF ¶¶ 142−43; Pl's Dep. 118:3–119:7.) Plaintiff's allegations relating to Eddie Monteiro—who was terminated on September 2, 2022—also predate the limitations periods under both Title VII and NJLAD. (D-SOF ¶ 124.) Given this statutory bar, the only timely allegations on which Plaintiff may rely is her testimony about Rui Ferreira. If the whole of Plaintiff's evidence discussed above is independently insufficient to support a hostile work environment claim, Mr. Ferreira's rude, but gender-neutral behavior and comments are inadequate as well. *Lacy*, 254 F. App'x at 936; *Alfano*, 294 F.3d at 374; *Dalton*, 2018 WL 305326, at *9; *Oncale*, 523 U.S. at 78; *Faragher*, 524 U.S. at 788.

Plaintiff cannot revive her time-barred facts under the "continuing action" doctrine. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002). Under this doctrine, a plaintiff may aggregate discriminatory acts "that are not individually actionable" or from outside the limitations period so long as he or she can show "that all acts which constitute the claim are part of the same unlawful employment practice and that at least one falls within the applicable limitations period." *Mandel*, 706 F.3d at 165–66 (cleaned up). "Factors to consider in determining whether a plaintiff can support a claim for a continuing violation are subject matter, frequency, and degree of permanence." *Lombard v. N.J. Dep't of Transp.*, No. 18-1319, 2018 WL 5617553, at *6 (D.N.J. Oct. 30, 2018).

Plaintiff cannot tether Mr. Ferreira's claimed obnoxious, albeit non-discriminatory conduct to Mr. Monteiro's "brash, direct and unpolished" leadership style in order to establish a continuing

violation.[37] (D-SOF ¶ 120.) Mr. Ferreira's comments during the limitations period were clearly not "similar conduct by the same individuals[] suggesting a persistent, ongoing pattern" as the wholly distinct conduct by Mr. Monteiro at least a year prior. *Mandel*, 706 F.3d at 167. Aside from Plaintiff's off-hand comment that Mr. Ferreira eventually became a "mini Eddie [Monteiro]," she does not link the conduct of the two in any way. (Pl's. Dep. 207:15–24.) Importantly, as noted, Plaintiff's testimony does not attribute Mr. Ferreira's conduct to Plaintiff's sex at all. (Pl's. Dep. 207:15–24.) There is also no apparent overlap in the record of the "subject matter, frequency, and degree of permanence" between Mr. Monteiro's conduct and Mr. Ferreira's. *Lombard*, 2018 WL 5617553, at *6. Accordingly, Plaintiff has made no showing that Mr. Ferreira and Mr. Monteiro's conduct was part of the same continuing violation and, therefore, cannot make out a hostile work environment claim based on sex discrimination.

### C. Failure to Hire Under Title VII and NJLAD

The Court turns to Plaintiff's asserted "failure to hire" claims under NJLAD and Title VII.[38] Also at the outset, the Court grants summary judgment on Plaintiff's failure to hire claims to the extent she asserts that ETS's failure to hire her was retaliatory. There are no facts in the record to indicate that any of the relevant hiring managers were aware of Plaintiff's alleged discrimination complaints; Plaintiff concedes that most of the hiring managers had never met or heard of her at all. (Resp. to D-SOF ¶¶ 77–78, 94, 96, 104–05; Chanoch Dep. 35:10–38:7.) Plaintiff's off-hand surmise that she believed she had a "scarlet letter" at ETS because of her claimed reporting does not suffice to impute such knowledge to the hiring managers. (D-SOF ¶

[37] Plaintiff's Opposition does not even attempt to link the conduct from her experiences in the HR department in 2012 to Mr. Ferreira's timely conduct. (*See* Opp. at 13–15.)

[38] Title VII and NJLAD failure to hire claims are analyzed concurrently. *See, e.g.*, *EEOC v. United Galaxy, Inc.*, No. 10-4987, 2013 WL 3223626, at *9 (D.N.J. June 25, 2013).

114.) This lack of knowledge precludes a retaliation claim. *See, e.g.*, *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."); *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) ("It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decisionmaker was not aware.").

Plaintiff also claims that she suffered gender discrimination because she was passed over for the following positions: (1) the Chief of Staff to the Global Chief Marketing Officer, (2) Corporate Governance Associate, (3) Director Product Management, (4) Executive Director, Product Line Manager.[39] To establish a *prima facie* case of employment discrimination based on sex, a plaintiff must show that: "(1) he or she is a member of a protected class; (2) was qualified for the position; (3) was not hired; and (4) that, under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to his or hers to fill the position." *Jones v. City of Phila. Fire Dep't*, 549 F. App'x 71, 72 (3d Cir. 2014) (per curiam). If a plaintiff meets this initial burden, the standard *McDonnell Douglas* burden shifting analysis proceeds accordingly: the defendant must articulate a legitimate, non-discriminatory reason for the rejection, and the plaintiff must demonstrate that this stated reason

[39] To the extent Plaintiff makes legal arguments in its response to Defendant's statement of facts that she does not then raise in her substantive brief, those arguments, which also violate the Local Rules, are forfeited. L. Civ. R. 56.1(a) ("Each statement of material facts . . . shall not contain legal argument or conclusions of law."); *Pasquinelli v. HUMBL, LLC*, No. 23-743, 2025 WL 3683266, at *1 n.3 (D. Del. Dec. 19, 2025) (finding that legal arguments only included in a separate statement of fact are forfeited if not discussed in brief and collecting cases).

is merely a pretext. *See, e.g.*, *EEOC v. United Galaxy, Inc.*, No. 10-4987, 2013 WL 3223626, at *9 (D.N.J. June 25, 2013).

1. Chief of Staff to the Global Marketing Officer, Director Product Management, and Executive Director, Product Line Manager Positions

With respect to the Chief of Staff to the Global Marketing Officer, Director Product Management, and Executive Director, Product Line Manager positions, Plaintiff offers only a non-specific, bulleted list of arguments without caselaw, she asserts that she was (1) "qualified and eligible" for all four positions, (2) Defendant "failed to consider or interview Plaintiff" for the positions, despite her experience and lack of performance issues, (3) Defendant "did not provide Plaintiff with any legitimate explanation for rejecting her or failing to even interview her for these positions," (4) and that the positions were filled with "non-complaining and/or male candidates, including external candidates." (Opp. at 23–25.) Because Plaintiff does not distinguish her argument with respect to these positions, the Court will assess them together.[40]

*a.* Prima Facie *Burden*

Defendant's Motion only contests the second element of Plaintiff's *prima facie* burden for these positions—Plaintiff's qualifications—arguing that Plaintiff was not qualified for the positions based on Plaintiff's purported lack of experience for each. (MSJ at 20.) When assessing a plaintiff's qualifications at the *prima face* step of a failure to hire claim, the Court only assesses whether a plaintiff "possessed the minimal objective qualifications for the position." *Fowler v. AT&T, Inc.*, 19 F.4th 292, 303 (3d Cir. 2021). The Court must only evaluate whether a plaintiff had the "objective experience and education necessary to qualify as a viable candidate" at this stage. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). Other subjective job

[40] The Court also notes that Plaintiff has failed to delineate which portions of her argument relate to her *prima facie* burden versus which arguments demonstrate pretext.

criteria—like a candidate's management or leadership skills—are more "properly cognizable at the later stages" of the burden-shifting framework. *Fowle v. C&C Cola*, 868 F.2d 59, 65 (3d Cir. 1989). Because Plaintiff possessed the various *objective* metrics listed in the job descriptions for these roles—relevant durations of experience and minimum degree requirements, among other things—Plaintiff has satisfied this minimal *prima facie* burden.[41] (ECF No. 44-5 at Exs. 30, 35–36; *see also* Reply to D-SOF ¶¶ 100, 106 (acknowledging that the hiring directors considered factors outside of the objective minimum requirements of the job description in their hiring decision).

*b. Legitimate, Non-Discriminatory Reasons*

Nonetheless, Defendant's articulated reasons for not hiring Plaintiff for these three positions are legitimate, non-discriminatory justifications. For the Chief of Staff to the Global Chief Marketing Officer position, Defendant preferred marketing experience, which its chosen candidate Josh Orye had (among other things) and Plaintiff did not. (D-SOF ¶¶ 66–70, 72–76.) For the Director Product Management position, Defendant sought "commerce-related functionality related to a product checkout cart" and other e-commerce experience, which its chosen candidate Giuseppe Arlia had and Plaintiff did not. (D-SOF ¶¶ 97, 99, 102; Chanoch Dep. 22:7–27:7, 35:10–38:7.) Finally, for the Executive Director, Product Line Manager position, Defendant sought "deep digital product management experience," which its chosen candidate Brad Bazemore had and Plaintiff did not. (D-SOF ¶¶ 104–08; ECF No. 44-5 at Ex. 19 ¶ 10.)

[41] Plaintiff arguably does not meet the minimum job qualifications for the Chief of Staff to the Global Chief Marketing Officer role. The job—whose title suggests a strong relation to marketing—included in its description that a "focus in marketing and product innovation [is] *preferred*." (ECF No. 44-5 at Ex. 30 (emphasis added).) Plaintiff's resume indicates no marketing experience. (ECF No. 44-5 at Ex. 29.) However, because this focus is simply "preferred" and Plaintiff otherwise meets the objective minimum criteria for the position, she has likely established a *prima facie* case. *Sempier*, 45 F.3d at 729.

*c. Pretext*

As noted above, in an attempt to demonstrate pretext, Plaintiff countered with boilerplate, generalized opposition, i.e., (1) she was not given an interview despite her qualifications; (2) she was not considered despite being an internal candidate with good reviews, and; (3) she was not given a reason for her non-selection at the time. (Opp. at 23–25.) Similar to the arguments regarding her termination, Plaintiff provided no basis to suggest that Defendant was under some legal or ETS-policy obligation to provide her with the reason for her non-selection for these positions. (Opp. at 24); *cf Leung*, 1999 WL 1240961, at *11 (finding that the defendant-employer had no obligation to explain itself to the plaintiff at the time of termination). The same is true regarding Defendant's decision not to interview her; in the absence of evidence showing discriminatory animus motivating the decision not to interview, employer-defendants are not obligated to offer qualified candidates an interview. *See Sarmiento v. Montclair State Univ.*, 285 F. App'x 905, 911 (3d Cir. 2008) (per curiam).

With respect to Plaintiff's final pretext argument—that Defendant did not interview or select her despite its "typical[]" preference for internal candidates—her assertion overstates the record. (Opp. at 24 (citing P-SSOF ¶ 18).) Plaintiff offers no citation to ETS documentation or reduction in force standards stating any "typical" preference or policy to hire internal candidates over external ones after a layoff. Instead, Plaintiff's cited testimony from her former supervisors, Scott Weaver and Scott Nelson, indicates that in each of their specific experiences as hiring managers, they would personally preferentially fill open positions with internal candidates following a layoff. (Weaver Dep. 66:6–67:4; Nelson Dep. 201:23–203:2 (stating that he would offer interviews as a "professional courtesy" after a layoff).) Neither witness suggested that this reflected ETS's standard policy, or the approach of other hiring managers at Defendant, with Mr.

Weaver even clarifying that he did not "recall any explicit benefit somebody internally would have over somebody externally." (Weaver Dep. 67:5–7.) Here, Plaintiff attempts to contrive a preference of two managers and transform it into a corporation-wide policy.

Plaintiff's specious contention is insufficient to create a genuine dispute of material fact that ETS had a general policy giving preference to internal candidates, let alone to suggest, by a preponderance of the evidence, that the hiring managers at issue violated that policy in not considering Plaintiff. *Ali v. Woodbridge Twp. Sch. Dist.*, No. 17-2210, 2019 WL 1930754, at *7 (D.N.J. Apr. 30, 2019) ("A plaintiff bears the burden of proving pretext by a preponderance of the evidence."), *aff'd*, 957 F.3d 174 (3d Cir. 2020). Ultimately, Plaintiff's quarrel with Defendant's hiring approach does not demonstrate pretext in the decision to hire other qualified candidates, and "[i]t is not the court's role to second-guess an employer's business judgment as to who is more qualified for the job." *Sarmiento v. Montclair State Univ.*, 513 F. Supp. 2d 72, 89 (D.N.J. 2007), *aff'd*, 285 F. App'x 905 (3d Cir. 2008) (per curiam).

2. <u>Corporate Governance Associate Position</u>

Plaintiff's only position-specific arguments relate to the decision by Jane Borden to hire Sade Peterkin over Plaintiff for the Corporate Governance Associate role. (Opp. at 24–25.) Defendant, at the outset, argues that Plaintiff fails to establish a *prima facie* case of discriminatory failure to hire, as Sade Peterkin—the woman selected—is within Plaintiff's protected class. (Resp. to D-SOF ¶¶ 80–81 (admitting that the two other candidates considered for the position were women).) Although not explicitly a requirement to establish the *prima facie* case of discrimination, the Third Circuit has recognized that this favorable treatment to someone outside of a plaintiff's protected class is the common means by which a plaintiff can demonstrate an inference of unlawful discrimination. *See Smith v. Sec'y U.S. Navy*, 843 F. App'x 466, 469 (3d Cir. 2021) (collecting

cases). However, the Third Circuit has clarified that subsequent favorable treatment by an employer of someone *within* a plaintiff's protected class does not necessarily foreclose a *prima facie* case. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999) (requiring only "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion" for *prima facie* case (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996))).

Here, Plaintiff presents no evidence to create an inference of discrimination based on sex. (Opp. at 24–25.) Plaintiff argues that the decision to hire Ms. Peterkin—"who did not even have the required years of experience of the role"—while declining to interview Plaintiff supports a failure to hire claim, particularly in light of Defendant's reference to "vague, subjective criteria not listed on the job description."[42] (*Id.*) This contention raises no inference of, or even relates to, sex in any obvious way that would allow a factfinder to discern a *prima facie* failure to hire based on sex claim. *See Samuels v. Postmaster Gen.*, No. 03-3482, 2007 WL 2212688, at *6 (D.N.J. July 30, 2007).

Even assuming, *arguendo*, that Plaintiff had offered facts to clear the "flexible" *prima facie* case threshold for this fourth element, Defendant presents a non-discriminatory, legitimate reason for Ms. Peterkin's selection. *Pivirotto*, 191 F.3d at 357. The hiring manager for the position testified that, although Plaintiff was qualified and considered for the role, she interviewed Ms. Peterkin and Ms. Hall first because they were much closer salary grades to the Corporate Governance Associate position than Plaintiff. (Resp. to D-SOF ¶¶ 80–82; Borden Dep. 43:16–19, 46:9–21, 49:15–50:1, 56:11–14 (Ms. Borden testifying that the open position was a salary grade

---

[42] Again, Plaintiff does not distinguish between the evidence she refers to for purposes of her *prima facie* case as opposed to evidence of pretext. Although these facts may be relevant to Plaintiff's argument that Defendant's reason was a pretext, they do not raise an inference of sex discrimination.

8, Ms. Peterkin was a salary grade 7, Ms. Hall was a salary grade 8, and Plaintiff was a salary grade 12).) After interviewing Ms. Peterkin, the hiring manager determined she was the top candidate for several reasons: (1) Ms. Peterkin appeared qualified, eager, and hungry for the role, (2) confidence in Ms. Peterkin's confidentiality, and (3) Ms. Peterkin's ability to pursue a master's degree while working full-time. (D-SOF ¶¶ 84–87.)

Plaintiff fails to demonstrate that these reasons were pretextual. As an initial matter, Plaintiff offers no counter to Defendant's proffered justification that the differences in salary grades between Plaintiff, the position, and other candidates were gender-neutral, non-discriminatory reasons which supported forgoing interviewing her and ultimately selecting Ms. Peterkin. (*See generally* Opp.) Plaintiff's own "overqualification" for the position does not undermine (and is in fact consistent with) this justification, and Plaintiff's pretext argument cannot simply challenge Defendant's business judgment. *Sarmiento*, 513 F. Supp. 2d at 89.

Plaintiff further argues that Ms. Peterkin, "undisputedly did not meet the qualifications" for the position, as she had only seven years of experience where the job description required eight. (Opp. at 24; Resp. to D-SOF ¶¶ 90, 93.) She also contends that Defendant's reference to certain of Ms. Peterkin's subjective traits were not qualities listed in the job description, and that Plaintiff herself possessed such qualities and abilities as well. (Opp. at 25.) Plaintiff's challenges to the factors Defendant considered amount to challenges of its business judgment, not evidence of pretext. As to the differential between Ms. Peterkin's seven but not eight years of experience, there is no requirement in hiring for an employer to strictly adhere to every requirement explicitly listed in a job description when making hiring decisions. *See Walters v. Norton*, 326 F. App'x 644, 651 (3d Cir. 2009) (citing *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007)). The Third Circuit has explained that although "[a]n employer may not use evaluating criteria which lacks any

relationship at all to the performance of the employee being evaluated," that "[a]bsent this type of violation . . . , we will not second guess the method an employer uses to evaluate its employees." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (citing *Fuentes*, 32 F.3d at 765.)

Hiring for any competitive corporate position is a highly discretionary, nuanced decision based on both objective and subjective criteria, and not generally subject to or reduced to simple, rigid, formulaic box-checking. Plaintiff has offered no evidence that Defendant's justifications were "so plainly wrong that [they] cannot have been a factor in [Defendant's] decision not to interview [Plaintiff]" or award her the job. *Sarmiento*, 285 F. App'x at 911 (citing *Keller*, 130 F.3d at 1109). Accordingly, summary judgment will be entered in Defendant's favor on each of these failure to hire claims.

### D. Pay Discrimination Under the EPA and NJLAD

Plaintiff's final claims at issue are pay discrimination claims under the EPA and NJLAD. Plaintiff argues that Defendant violated these acts by paying two other Executive Directors in her organization, Matthew Welsher and Peter Yeager, higher compensation than she received.[43]

#### 1. Equal Pay Act

"The Equal Pay Act prohibits employers from discriminating based on sex by paying wages to employees at a rate less than the rate at which he pays wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 468 (3d Cir. 2010) (cleaned up) (quoting 29 U.S.C. § 206(d)). EPA claims are subject to a two-step burden-shifting paradigm. "The plaintiff must first establish a prima facie case by

[43] As noted above, even though the salary data appears to suggest that Plaintiff actually earned more than Mr. Yeager in 2022, Defendant does not dispute that Plaintiff earned less in total compensation from 2022 to 2023 than Mr. Welsher and Mr. Yeager. (D-SOF ¶¶ 159, 162.)

demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions. The burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (citation omitted) (citing *EEOC v. Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1413–14 (3d Cir. 1988)).

For this *prima facie* case, "[t]he crucial finding on the equal work issue is whether the jobs to be compared have a common core of tasks, *i.e.,* whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different." *Rhoades v. Young Women's Christian Ass'n*, 423 F. App'x 193, 197 (3d Cir. 2011) (cleaned up) (quoting *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985)). This requires a plaintiff to prove similarity of "actual job content," not simply the similarity or difference in "job description" or "the name under which the position is classified but what was actually done [at the jobs]." *Brobst*, 761 F.3d at 155 (collecting cases).

Plaintiff fails to meet this *prima facie* burden. Plaintiff offers no facts regarding Mr. Welsher's and Mr. Yeager's "actual job content," pointing only to the shared job title of Executive Director and naked, unsubstantiated assertions of "identical" job descriptions. *Id.*; (*see* Opp. at 17–18.) Such is plainly inconsistent with the Third Circuit's mandate, which requires a comparison of the "common core" of tasks, whether the employees undertook "work of substantially equal skill, effort and responsibility, under similar working conditions." *Rhoades*, 423 F. App'x at 197; *Stanziale*, 200 F.3d at 107. Even Plaintiff's singular argument about job description is largely unsupported, with her only citation to the record to her own, self-serving declaration. (*See* ECF No. 45-7 ¶ 2 ("I am unaware of there being different job descriptions for Executive Director roles

within Scott Nelson's organization at ETS. To the best of my knowledge, there is only one job description for the role of 'Executive Director' within Scott Nelson's organization at ETS.").) This non-specific assertion does not create a genuine issue of material dispute. Instead, it makes plain Plaintiff's admitted lack of personal knowledge on the issue.

By contrast, Defendant offers ample evidence to suggest that Plaintiff, Mr. Welsher, and Mr. Yeager did not share a common core of tasks. Mr. Welsher was one of two employees responsible for ETS's College Board contract, worth approximately $340 million. (D-SOF ¶¶ 147–48, 150.) Mr. Nelson averred that this contract was "incredibly complex, requiring many ETS employees who worked on it to be on call around the clock 24/7." (ECF No. 44-4 ¶ 5; Nelson Dep. 51:20–54:19.) Mr. Yeager, moreover, worked in ETS's Government Relations function, where he was tasked with "procuring government contracts with foreign countries throughout the world to provide education-based services" and meeting with foreign officials at the Education World Forum. (D-SOF ¶¶ 151–54, 157; ECF No. 44-4 ¶ 8.)

In comparison, Plaintiff's tasks in 2022 and 2023 were split 60:40 on corporate strategy work and managing ETS's AIAST business, a "loss center" with gross profit margins hovering around $1.6–1.7 million from 2022 to 2024. (D-SOF ¶¶ 12–13, 15–16, 18.) Plaintiff offers no facts to indicate, despite these clearly separate spheres of work and influence, that she, Mr. Yeager, and Mr. Welsher shared anything other than a job title. *See* 29 C.F.R. § 1620.13(e) ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance. . . . Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard."). Instead, the distinct day-to-day tasks of the positions militate against finding Plaintiff's *prima facie* EPA case. *Rhoades*, 423 F. App'x at 197–98 (affirming summary judgment on EPA claim where

plaintiff did not show common core of tasks); *see also Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 698–700 (7th Cir. 2003) (finding that plaintiff had failed to established prima facie EPA case at summary judgment where other employees generated orders of magnitude larger revenue for employer). Accordingly, summary judgment is awarded to Defendant on Plaintiff's EPA claim.[44]

2. NJLAD Equal Pay Claim

The 2018 Diane B. Allen Equal Pay Act's amendment to NJLAD ("NJEPA") provides that "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer to pay any of its employees who is a member of a protected class at a rate of compensation, including benefits, which is less than the rate paid by the employer to employees who are not members of the protected class *for substantially similar work*, when viewed as a composite of skill, effort and responsibility." N.J. Stat. Ann. § 10:5-12(t) (emphasis added). Given the similarity in language to the EPA, several courts in this District that have encountered NJLAD equal pay claims have analyzed them under the EPA's framework. *Adams v. Capacity*, No. 23-23265, 2026 WL 821566, at *19 (D.N.J. Mar. 25, 2026); *Eskinazi v. Corp. Subscription Mgmt. Servs., LLC*, No. 25-4879, 2026 WL 445809, at *13 (D.N.J. Feb. 17, 2026) (citing *Spiewak v. Wyndham Destinations, Inc.*, No. 20-13643, 2023 WL 869309, at *10 (D.N.J. Jan. 26, 2023)).

As with Plaintiff's EPA claim, Plaintiff fails to state a claim under the NJEPA's "substantially similar work" standard. N.J. Stat. Ann. § 10:5-12(t). Plaintiff's only evidence of the similarity in her job to Mr. Welsher's and Mr. Yeager's is her own declaration, stating that she is unaware of any other job descriptions for Executive Directors in Mr. Nelson's organization. (ECF

---

[44] Because Plaintiff fails to establish a *prima facie* case, the Court need not resolve whether Defendant has stated an affirmative defense under the EPA. *See Rhoades*, 423 F. App'x at 197 n.2.

No. 45-7 ¶ 2.) Nothing in the NJEPA's list of relevant comparators—"a *composite of skill, effort and responsibility*"—indicates any material distinction from the federal EPA. *Id.* (emphasis added). Reliance on title and a generalized but unspecified reference to job description to show substantial similarity is also inconsistent with the March 2020 guidance on the NJEPA provided by the New Jersey Division on Civil Rights which, as with the EPA, states that under the NJEPA, "[j]ob titles and job descriptions do not necessarily keep pace with the actual nature of duties and responsibilities performed by employees." Rachel Wainer Apter, "Guidance on the Diane B. Allen Equal Pay Act," N.J. Office of the Att'y Gen., Div. of C.R. (Mar. 2020), https://www.nj.gov/lps/dcr/downloads/DCR-Equal-Pay-Guidance-3.2.20.pdf. Accordingly, because Plaintiff has offered no evidence to suggest that the composite of skill, effort, and responsibility required between the three Executive Directors is substantially similar, summary judgment is likewise appropriate on Plaintiff's NJEPA claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 44). An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2026